UNITED STATES, Appellee

v.

Juan F. DIAZ, Specialist
U.S. Army, Appellant

No. 02-0513

Crim. App. No. 9900768

---

United States Court of Appeals for the Armed Forces

Argued April 1, 2003

Decided September 17, 2003

GIERKE, J., delivered the opinion of the Court, in which
EFFRON, BAKER, and ERDMANN, JJ., joined.  CRAWFORD, C.J., filed
a separate opinion concurring in part and dissenting in part.

Counsel

For Appellant:  Captain Terri J. Erisman (argued); Colonel Robert
    D. Teetsel, Lieutenant Colonel E. Allen Chandler, and Major
    Imogene M. Jamison (on brief); Colonel Adele H. Odegard.

For Appellee:  Captain Matthew J. MacLean (argued); Lieutenant
    Colonel Margaret B. Baines, Lieutenant Colonel Lauren B.
    Leeker, and Major Jennifer H. McGee (on brief).

Amicus Curiae:  Emily C. Tarr (law student)(argued); Henry J.
    Hogan, III, Esq. (supervising attorney), Kathryn V. Chelini
    and Brian W. Earley (law students)(on brief) – for New
    England School of Law, Military Justice Appellate Advocacy
    Program.

Military Judge:  Richard J. Hough

   **This opinion is subject to editorial correction before final publication.**

Judge GIERKE delivered the opinion of the Court.

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of unpremeditated murder and assault upon a child under 16 years of age, in violation of Articles 118 and 128, Uniform Code of Military Justice [hereinafter UCMJ] 10 U.S.C. §§ 918, 928 (2000), respectively. The adjudged and approved sentence provides for a dishonorable discharge, confinement for life, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence. United States v. Diaz, 56 M.J. 795 (A. Ct. Crim. App. 2002).

This Court granted review of the following issues:[1]

I.

WHETHER THE MILITARY JUDGE ERRED IN ALLOWING GOVERNMENT EXPERTS TO TESTIFY REGARDING PRIOR INSTANCES OF ALLEGED MISCONDUCT.

II.

WHETHER THE MILITARY JUDGE ERRED IN DENYING THE DEFENSE MOTION FOR A MISTRIAL FOLLOWING THE IMPROPER TESTIMONY OF TWO GOVERNMENT WITNESSES.

III.

WHETHER THE MILITARY JUDGE ERRED IN FAILING TO SUPPRESS APPELLANT'S STATEMENTS, OBTAINED BY CPT TREMAINE IN VIOLATION OF APPELLANT'S RIGHT UNDER ARTICLE 31, UCMJ, SOLELY BECAUSE OF CPT TREMAINE'S STATUS AS A MEDICAL DOCTOR.

IV.

WHETHER APPELLANT'S RIGHT TO DUE PROCESS WAS VIOLATED WHEN THE MILITARY JUDGE ERRONEOUSLY FAILED TO SUPPRESS APPELLANT'S STATEMENTS TO MS. AMLIN WHERE (1) SUCH STATEMENTS WERE NOT PRECEDED BY ARTICLE 31 WARNINGS WHICH

---

[1] We heard oral argument in this case at New England School of Law, Boston, Massachusetts, on April 1, 2003, as part of "Project Outreach." See United States v. Allen, 34 M.J. 228, 229 n.1 (C.M.A. 1992).

WERE REQUIRED TO BE GIVEN SINCE MS. AMLIN WAS ACTING AS AN INSTRUMENTALITY OF THE MILITARY; (2) ARMY REGULATION 608-18 REQUIRES THAT SOCIAL WORKERS PROVIDE ARTICLE 31 WARNINGS PRIOR TO QUESTIONING A SOLDIER ABOUT DOMESTIC ABUSE AND SUCH REGULATION WAS INTENDED TO CONFER A SUBSTANTIAL RIGHT ON THE ACCUSED; AND (3) WHERE SUCH STATEMENTS WERE UNLAWFULLY INDUCED IN VIOLATION OF ARTICLE 31(d) AND THE FIFTH AMENDMENT PROHIBITION AGAINST COMPULSORY SELF-INCRIMINATION THROUGH THE REMOVAL OF APPELLANT'S DAUGHTER FROM HIS CUSTODY BY CHILD PROTECTIVE SERVICES TWO YEARS BEFORE AND BY THE THREAT THAT IF HE DID NOT CONFESS TO INTENTIONALLY HARMING HIS DAUGHTER HIS PARENTAL RIGHTS WOULD BE PERMANENTLY TERMINATED.

For the reasons set out below, we reverse the decision of the Court of Criminal Appeals. Because we address Issues I and II and hold for Appellant, we do not reach Issues III and IV.

## I. BACKGROUND AND OVERVIEW

The charges against Appellant arose from a series of severe injuries to Appellant's two infant daughters, Nicole and Jasmine, and the death of Nicole, all occurring between January 1993 and July 1995. Each injury and Nicole's death occurred while Appellant was alone with the children. Appellant's pretrial statements provided his only explanation of the circumstances of the injuries and the death.

The prosecution attempted to prove its case by establishing a "pattern of abuse by [A]ppellant against his infant daughters" in both uncharged misconduct and the charged offenses. Diaz, 56 M.J. at 798. Appendix A to this opinion is the prosecution's "Chronology" used by the trial counsel in the opening statement to demonstrate this alleged pattern of abuse. The prosecution's case was built on expert medical testimony, Appellant's admissions, and circumstantial evidence.

The defense objected to the admissibility of the uncharged misconduct and Appellant's admissions. The defense also filed

repeated motions in limine to limit the scope of expert medical testimony thereby laying the foundation for each of the granted issues.

While each of these issues invites scrutiny, we need not address all of them.  A critical error at trial was the testimony of a key prosecution medical expert who, contrary to the explicit ruling of the military judge and the apparent direction of the trial counsel, testified that Appellant killed his infant daughter.  This error was compounded by similar testimony by a social worker.  The judge denied a defense motion for a mistrial and attempted to cure the error by giving a curative instruction to the members.  It is the impact of this error on the entire proceeding that is the focus of our decision.  See ___ M.J. (2)(Granted Issues I and II).

## II. FACTS

### A. Burns and other physical injuries to Nicole Diaz

On November 25, 1992, Nicole was born to Appellant and his wife.  On January 23, 1993, Nicole was sick with a cold -- runny nose and coughing.  Following the direction of a nurse at the Fort Sill, Oklahoma, clinic, Mrs. Diaz purchased a vaporizer.  Mrs. Diaz read the directions and set it up in the bedroom she and Appellant shared with the baby.

While Mrs. Diaz was in the shower, Appellant placed Nicole over the vaporizer, which resulted in her being seriously burned. The burn extended from her upper lip to her hairline on the entire left side of her face.  When Mrs. Diaz returned to the bedroom, Appellant told her that he heard Nicole's congestion and

"that he'd put her over the vaporizer to help her breathe, because it would help her breathe better."

Immediately, they took Nicole to Reynolds Army Community Hospital in Fort Sill. Nicole was flown to Children's Hospital in Oklahoma City for treatment because she had second degree burns. While treating Nicole, doctors at Children's Hospital noted other injuries, including bruises to her face and chest. X-rays revealed leg fractures and healing posterior rib fractures, which appeared to be seven to fourteen days old.

Dr. Oscar Falcon was interning at Children's Hospital on the night Nicole was admitted for her burn. Dr. Falcon was working in the plastic surgery department and examined Nicole. He saw the burns on her face and bruises to her face and chest.

Dr. Falcon interviewed both Appellant and Mrs. Diaz as part of the treatment. Appellant told Dr. Falcon that Nicole was burned when "the steamer had fallen and hot water had splashed over [Nicole's] face." This was different from what Appellant previously told his wife. At trial, Dr. Falcon testified that he was "99 percent sure" that Appellant informed him of how Nicole was burned, as opposed to Mrs. Diaz, but conceded that he was not "100 percent sure" because six years had elapsed between his treatment of Nicole and his trial testimony.

These events triggered a report of suspicion of abuse and neglect to Oklahoma social services department. The source of the report is unclear from the record. Following up on this report, Dr. John H. Stuemky, another doctor, examined Nicole. Dr. Stuemky was a pediatrician with over thirty years of experience and wearing "many hats." He was an associate

5

professor of pediatrics at the University of Oklahoma College of Medicine. He also served as Chief of the Pediatric Service, Medical Director of the Emergency Department, and Chairman of the Child Protection Committee for Children's Hospital.

The Child Protection Committee is charged with reviewing cases of suspected child abuse and neglect. This committee ensures that appropriate information is collected in the hospital (the medical findings, medical evaluations, social service reports) and is shared with the appropriate investigatory agencies to evaluate suspicions of abuse and neglect. As chairman of the committee, Dr. Stuemky evaluated Nicole.

Dr. Stuemky examined Nicole's burns and reviewed the medical records and X-rays. The X-rays showed three posterior rib fractures. He made sure this information was passed on to Child Welfare and other appropriate agencies.

Also at Children's Hospital, Ms. Jo Ellen Copeland, a social worker, questioned Appellant about possible abuse of Nicole. Appellant admitted bruising Nicole and made conflicting statements about how she suffered the burns. Appellant first told her that he held Nicole over the vaporizer for three to four seconds, then changed it to between eight and ten seconds. In this and two later interviews, Appellant provided three different descriptions of how he held Nicole when she was burned.

Ms. Copeland asked that the police be contacted and that Nicole be placed in protective custody. Nicole was placed in foster care, where she remained in excellent health and thrived. On November 5, 1993, when Nicole was approximately one year old, she was returned to the care and custody of her parents.

### B. The death of Nicole Diaz

On February 11, 1994, Nicole died while she was alone with Appellant.  Nearly twelve hours after Nicole's death, in a videotaped interview with Lawton Oklahoma Police, Appellant said that he and his wife again were in the bedroom of their apartment with Nicole sleeping in her crib.  Appellant removed Nicole from her crib because she was coughing.  He gave her some Dimetapp cough medicine and laid her on his lap as he watched television in the living room.

After sitting with Nicole for about fifteen minutes, he picked her up to put her back in her crib.  At that time, he noticed Nicole was limp and not breathing.  Appellant claimed that Nicole did not indicate any distress before she died.  Appellant unsuccessfully tried to resuscitate her.  He then went to the bedroom and woke Mrs. Diaz.  After Mrs. Diaz telephoned a neighbor for advice, she and Appellant drove Nicole to Reynolds Army Community Hospital, a short distance from their apartment.

Mary Hyde, a registered nurse, was working at Reynolds Army Hospital.  At the reception desk, she observed Nicole, who was "obviously unresponsive," lying limp across Mrs. Diaz's arms.  Mrs. Diaz told Ms. Hyde that Nicole had been unresponsive for "[a] while."  Nicole was not breathing and she did not have a pulse.  Her eyes were fixed and dilated.  There were no obstructions to her breathing.  Ms. Hyde brought Nicole to the trauma room, where she and a doctor unsuccessfully attempted to resuscitate her.

Dr. Larry Balding, a Deputy Medical Examiner in the Office of the Chief Medical Examiner in Oklahoma, performed an autopsy

on Nicole. The external examination of Nicole's body revealed marks caused by efforts to resuscitate her and a "hypopigmented area, meaning the skin was a little darker" on Nicole's "left cheek, right under the left eye." There were also two small bruises to her scalp which were revealed by opening the scalp. Dr. Balding concluded that these bruises occurred before Nicole's death.

Dr. Balding conducted an internal exam and determined "as far as the internal organs go, there was no evidence of injury or natural disease." There was "no evidence of intracranial hemorrhage or infection" and the brain was "normally formed and show[ed] no evidence of injury or disease." The toxicology screen showed small amounts of over-the-counter cold medication and the presence of drugs used in resuscitation attempts but "was essentially negative . . . in terms of having any relation to causing the death."

While Dr. Balding "could find no cause of death," he noted the death as "suspicious." He "felt that the past history of unexplained or inadequately explained injuries in this child is a significant condition." The autopsy report listed Nicole's cause of death as "unknown" and the manner of death as "undetermined." Dr. Balding opined that the autopsy findings were consistent with a death by suffocation. He also opined that he could not rule out a Sudden Infant Death Syndrome (SIDS) type death in this case. However, he did not use that diagnosis because "the injuries [to Nicole] were enough to make [him] say that [he] couldn't use that diagnosis."

## C. Burns to Jasmine Diaz

In September 1994, several months after Nicole's death, Appellant was transferred to Hawaii. On January 5, 1995, Appellant's wife gave birth to a second daughter, Jasmine. On July 30, Appellant burned Jasmine's inner left thigh with the tip of a heated cigarette lighter. This was the third reported incident of Appellant's infant daughters suffering harm when alone with him. Appellant claimed that he accidentally dropped the lighter on Jasmine as he was trying to ignite a caterpillar or centipede that had crawled into her crib.

The next day, Appellant's wife presented Jasmine to Dr. Elizabeth Abinsay, a pediatrician at St. Francis Medical Center-West in Ewa Beach, Hawaii, who treated Jasmine for the burn to her left thigh and also an ear infection. Dr. Abinsay evaluated the injury as a second degree burn and provided follow-up treatment in both August and September.

## D. Further investigation into possible child abuse

After Jasmine was burned, Hawaii Child Protective Services (CPS) initiated an evaluation of Jasmine for suspected child abuse and neglect. In October 1995, Jasmine was admitted to the pediatric ward at the Tripler Army Medical Center, Hawaii, where Captain Ladd Tremaine, M.D., a board-certified pediatrician, evaluated Jasmine's injuries to determine if they were the result of accidental or non-accidental trauma. He examined a "well healed scar on the left medial aspect of her upper thigh that had essentially a branding pattern to it, potentially three different distinct areas." Dr. Tremaine determined that the burns were "classic branding injur[ies]" and were not incurred accidentally.

As part of the evaluation, Dr. Tremaine talked to Appellant. According to Dr. Tremaine,

> Specialist Diaz reported that Jasmine had been laid down to sleep that night, and when he went in to look in on her, he noticed a centipede laying in her crib. He proceeded to obtain his lighter and to chase the centipede around the bed and try to burn the centipede. While he was doing that, he reported that he'd taken Jasmine into his wife's -- where his wife was, and his wife was in their bedroom. He went back, got Jasmine, went to the living room, reported lighting a cigarette and dropping the lighter on Jasmine's leg.

Following Dr. Tremaine's evaluation, CPS removed Jasmine from her parents' custody.

At some unspecified time in 1996, Dr. Stuemky, acting as a member of the Death Review Board of Oklahoma (Death Review Board), became involved in the investigation of Nicole's death. This is an official state board (including physicians, nurses, and members of the law enforcement community) that conducts a multi-disciplinary review of every death of a child under the age of 18 "so no deaths would escape notice." One function of the Death Review Board is to collect all agency and medical reports and records so that local officials could have access to all information relating to the death of a child.

Based on his review of this case, Dr. Stuemky concluded that Nicole's death was a homicide and Appellant was the perpetrator. The Death Review Board contacted the military to make sure the investigators in the Army were aware of Nicole's previous injuries. In July 1997, Appellant was transferred to Fort Drum, New York. Mrs. Diaz remained in Hawaii to retain custody of Jasmine.

Appellant met four times with Ms. Reagan Amlin, a clinical social worker in the Family Advocacy Program dealing with high-risk families and clients at Fort Drum. In November and December 1997, Appellant sought counseling as required by the CPS in order to be reunited with Mrs. Diaz and Jasmine. The purpose of this therapy was for Appellant "to take ownership of the abuse, to take responsibility for the abuse . . . ." It was also to help Appellant understand "the enormity of the consequences to the child." At the third session, following their discussion of Jasmine, Ms. Amlin questioned Appellant about Nicole's burn. According to Ms. Amlin:

> [Appellant] indicated that . . . Mrs. Diaz was asleep, it was late at night. Nicole had a cold, and he removed the child from the crib and placed her face over a steamer. He indicated that he was holding [Nicole] over the steamer with her face getting the steam. He indicated that he was doing that to help her breathe . . . . He indicated that [Nicole] made no movement at all, and he didn't realize he was burning the child, and the child didn't give any indication that [she] was being hurt.

Appellant and Ms. Amlin next discussed Nicole's death. According to Ms. Amlin, Appellant informed her

> that the night Nicole died, again, Mrs. Diaz was sleeping. He'd taken Nicole from the crib, was sitting on the sofa in the living room and, again, watching TV. He indicated . . . that when he was ready to go to bed, he took the child to put her back in the crib, and it was at that time that he discovered that the child had died.

When she asked if he covered Nicole's mouth and nostrils to see what would happen, Appellant responded, "I just want to be normal. I'm never going to get my family back. What will happen to me if I go to jail[?]" At this time, Appellant gave Ms. Amlin a "rather strange expression . . . it was rather like a smirk at

11

first."  After this session, Ms. Amlin reported Appellant to U.S. Army Criminal Investigation Command (CID).

During the fourth session, Ms. Amlin discussed the nature of the injuries to the children and the patterns she was seeing. Ms. Amlin told Appellant that she believed he killed Nicole.  In response, Appellant asked, "What will happen to me?" and indicated he was afraid of going to jail.  Appellant also indicated that "he did not know anything until he put her into the bed, and then he realized that she was dead."

Ms. Amlin told Appellant, "I'm very convinced that you killed Nicole."  Appellant paused and then said, "You don't know the half of it."  Appellant started questioning what was going to happen to him and said, "I'm never going to get my family back." Ms. Amlin "felt at that time that he started to realize that he'd said an awful lot, and that it wasn't going to be very helpful to him as far as [CPS] went."  The fourth session concluded with Appellant getting angry and stating that he probably would not be back.

Based on these facts, on October 28, 1998, two charges were preferred against Appellant -- murder of Nicole by suffocating her and aggravated assault of Jasmine by burning her on the leg with a cigarette lighter.  These charges were referred to a general court-martial on February 11, 1999.[2]

---

[2] By this time, the prosecution of Appellant for the November 1992 burning of Nicole with the vaporizer was barred by the statute of limitations.  See Article 43(b)(1), Uniform Code of Military Justice, 10 U.S.C. § 843(b)(1) (2000)(five-year statute of limitations).

### III.  TRIAL DEVELOPMENTS RELATED TO
### APPELLANT'S MOTION FOR A MISTRIAL

Expert medical testimony was the centerpiece of both the prosecution and the defense.  The prosecution's case included four medical experts who testified about both the charged offenses of abuse and Appellant's uncharged misconduct to establish a pattern of Appellant abusing his daughters.  The defense relied on testimony of two medical experts, including one prosecution doctor whom the defense adopted as its own witness.  The defense also elicited testimony on cross-examination from two other prosecution experts to challenge the prosecution's theory.  The defense used expert testimony to bolster the Appellant's explanation of accidental burns to both girls.  Expert testimony was also used to assert "crib death" or SIDS as Nicole's cause of death.

As Appellant did not testify at trial, both parties relied on Appellant's pretrial statements to provide his explanation of the circumstances of the injuries and the death.  In these pretrial statements, Appellant persistently denied culpability in the death of Nicole.  Also, Appellant repeatedly admitted inadvertently and accidentally causing some injury to the girls, although with sometimes conflicting explanations as to the circumstances of the injuries.  On one occasion, Appellant admitted that he intentionally burned Jasmine, but the defense argued his admission was to satisfy a social service agency requirement and to placate a social worker who insisted that Appellant "accept the guilt of this" and get help before Appellant could be eventually reunited with Jasmine.

Before this Court, Appellant asserts that the testimony of two government witnesses, Ms. Amlin and Dr. Stuemky, should have resulted in a mistrial. The specific testimony at issue is:

1. Ms. Amlin's testimony that she confronted Appellant with her personal belief that Appellant killed Nicole;

2. Dr. Stuemky's testimony as to his conclusions regarding Nicole's death: "My conclusions were that this was a homicide death – that this was a physical abuse death. And furthermore, I felt that the perpetrator was the father."

## A. Ms. Amlin's testimony

Trial defense counsel moved in limine to prevent Ms. Amlin from rendering any opinion about what she thought happened to Nicole. The Government responded that it did not intend to elicit that opinion. However, during her testimony, Ms. Amlin, in explaining the purpose of the therapy, stated, "My job is to make sure very clearly that this individual is guilty of what he's being accused of." Later, Ms. Amlin indicated that she confronted Appellant with her belief that he had killed Nicole. The morning after Ms. Amlin testified, defense counsel expressed concern that Ms. Amlin had testified as to her opinion that this was a homicide when she stated, "I was convinced that he killed his daughter." The military judge responded:

> I'm going to give a limiting instruction to the effect
> of whatever extent the [members] might come to that
> conclusion by her testimony. That expression -- I
> remember one. It might've happened more than that. It
> concerned me last night when I thought about it,
> because I think the [members] could be misled into
> believing that her feeling was that he did it. That
> expression was used in the course of her therapy to
> talk to her client. That wasn't her standing up here

saying "I know he did it." I'll give a limiting instruction. I just wanted to clarify what you were talking about.

The military judge provided the following limiting instruction concerning Ms. Amlin's testimony:

> Members of the court, yesterday afternoon you heard the testimony of Ms. Reagan Amlin. She testified about her four sessions with Specialist Diaz. She testified that during one or more of the sessions, she told Specialist Diaz that she either didn't believe him, or she confronted him with her thoughts that a crime was committed. You members, as the voice of the community, have to decide the issues in this case based upon the evidence that's presented to you in court. Nobody can tell you what happened. That's your job and there are no shortcuts. There is no witness that can tell you that a crime occurred; that's your job to determine that issue.
>
> So to the extent that you believe that Ms. Amlin testified or implied that she believed that Specialist Diaz committed a crime, committed a murder, committed an intentional burn, you may not consider that as evidence that a crime occurred, because that's your job. She used that technique during her therapy to talk with the client. Do you understand what I'm telling you here? You've got to make the decisions in this case, and there's nobody that can shortcut your job, although I'm sure that would make it easier for you.

The members indicated they understood the instruction.

## B. Dr. Stuemky's testimony

During a session pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000), defense counsel requested that Dr. Stuemky be instructed not to mention uncharged misconduct beyond the Government's notice pursuant to Military Rule of Evidence 404(b) [hereinafter M.R.E.]. Defense counsel also sought to prevent Dr. Stuemky from stating that, in his opinion, Nicole's death was a homicide, and from stating whether the Death Review Board had determined that it was child abuse or a homicide.

The military judge ruled that the doctor could testify as an expert on the ultimate issue, that Nicole's death was a homicide, and that he could, with some limitations, testify generally about the nature and function of the Death Review Board. In making his ruling the judge stated:

> Concerning the defense's objection to the testimony of Dr. Stuemky as to the ultimate issue, I'm denying that motion in limine. I find that his testimony, given the case to this point, is material, and I believe it's probative. I believe he has the qualifications to do it, from what I've been told by counsel. I believe that the information he relied upon is information that would put him in a unique position to be able to make that determination. Applying a[n] [M.R.E.] 403 balancing test, I find that the probative value of the evidence is not substantially outweighed by the likelihood of harm to the accused.
>
> Concerning his testimony about this [Death Review Board], I'm going to allow him to testify about the [Death Review Board], why it was created, what they do. I'm not going to let him talk about any statistics concerning the [Death Review Board], as to how many times they're correct, or how many times they're wrong, or anything like that. I will allow him to testify about his background with the [Death Review Board], how many investigations he's conducted and he's been involved in.
>
> Concerning his testimony about the basis for his determination, I believe he has a sufficient basis to form the opinion that he's going to offer. I would tell the defense, however, that depending on what their cross is, and how they attack him, you may open the door as to his testifying about other evidence that he considered.

Government counsel represented to the court that he would speak with Dr. Stuemky to "make it very clear to him as to what [he] can or cannot testify to." Also, immediately before Dr. Stuemky's testimony, the judge gave the limiting instruction

16

regarding the limitations on Ms. Amlin's testimony including the admonition, "There is no witness that can tell you that a crime occurred."

Dr. Stuemky testified about his role in the Child Protection Committee and his initial involvement with Nicole. He explained that he had examined Nicole after she had been burned in January 1993. He first testified regarding her injuries. He told the panel that he noticed the bruises on Nicole's face and her fractured posterior ribs. He explained the significance of these injuries in children and opined that in small children the only cause of posterior rib fractures is child abuse.

Next, Dr. Stuemky testified about his involvement in the review of Nicole's death by the Death Review Board. He explained how the Death Review Board obtained and evaluated all the information relating to Nicole's early injuries including her burn and information relating to her death. He testified in detail about SIDS. He explained that the National Institutes of Health has defined SIDS as "a sudden, unexplained death in an infant under 12 months of age in whom an autopsy has in fact been performed, and no other cause or abnormalities are noted, and in whom an adequate death scene investigation has been performed; and in whom all associated records and that sort of thing are evaluated by the appropriate agencies." He stated that "SIDS is primarily an event that occurs in infants under 6 months of age. Ninety percent of SIDS deaths are under 6 months of age . . . with the peak time of SIDS deaths between 2-4 months of age."

Interrupting the direct examination, the military judge suggested taking a break. After a few more questions, trial

counsel acquiesced and requested a recess.  Before the trial

resumed and in an Article 39(a) session, the judge sua sponte

revisited his ruling on the limits of Dr. Stuemky's testimony

stating:

> Earlier when I ruled about the ultimate
> conclusion, I want to make clear that you
> understand what my ruling is.  My ruling is not
> that this witness can say, "Specialist Diaz
> murdered his daughter."  My ruling does allow you
> to ask whether the injuries are consistent with a
> child abuse death; whether he has an opinion as
> to whether the injuries were caused by child
> abuse; whether he has an opinion as to whether
> this was a SIDS death, or inconsistent with a
> SIDS death.  I'll let him do that.  I want to
> make sure you understand that my ruling did not
> say that he could stand up there and point a
> finger at specialist Diaz and say, "He killed his
> daughter."  Do you understand my prior ruling?

Assistant trial counsel responded that he understood the ruling.

Dr. Stuemky then continued his testimony discussing the

factors the Death Review Board considers when evaluating a

possible SIDS death in general and the evidence relating to

Nicole's death in particular.  Dr. Stuemky stated, "Our concern

is that something had to have caused this death.  And our concern

is that it's most likely consistent with suffocation."

At this point, the following occurred in assistant trial

counsel's questioning of Dr. Stuemky:

> Q.   Did you come to any conclusion with regard
>      to your review of Nicole's death and the
>      reports?
>
> A.   Yeah, our Child Protective Team ---
>
> Q.   Did you come to any conclusions, sir, by
>      your review?
>
> A.   Yes, I did.
>
> Q.   What were your conclusions?

> A. My conclusions were that this was a homicide death -- this was a physical abuse death. And furthermore, I felt that the perpetrator was the father.

Assistant defense counsel immediately asked for an Article 39(a) session. In closed session, the defense asserted the following:

> Your Honor, we move for a mistrial, that's strike three. That's the third time we have moved in limine to exclude testimony from a government witness that . . . blurted it out. Your Honor, this is particularly disturbing because you specifically told [Government counsel] that the witness could not say that. We move for an immediate mistrial.

Trial counsel responded.

> Yes, sir, we object to moving for a mistrial. That was totally unexpected. I did, during the last recess, talk with Dr. Stuemky and gave clear instructions on what he could and could not say, and that was one of the matters that we spoke of. He could talk about exactly as you had instructed – prior to the last break, I went out and reiterated everything. I stated that he could say it was consistent with child abuse. Again, Your Honor, I did not expect that. I did instruct that witness he could not go there.

Defense counsel responded, "Your Honor, everybody expected it. We talked about it ahead of time. Everybody expected that. That is highly prejudicial, Your Honor, and there's no way to cure it."

After an eleven minute recess, the military judge immediately provided the following curative instructions to the members:

> Members of the court, early on in this trial and during the case on several occasions, I've told you that you have to decide the facts in this case, and you have to make a determination as to whether a crime occurred. You have to make a determination as to the believability or credibility of witnesses. And you have to follow my instructions . . . . [Y]ou all assured me that you could do that.

I'm going to give you some instructions concerning expert testimony. An expert – a person is allowed to testify as an expert because his testimony may be helpful to you in coming to conclusions about issues. The witness you've been hearing has been qualified as an expert in a specific discipline because his knowledge, skill, experience, training or education may assist you in understanding the evidence, or in determining a fact in issue. But [t]he point is that you have to determine the fact in issue. Do you understand that?

[Affirmative responses from the Members]

You are not required to accept the testimony of an expert witness or give it any more or less weight than that of an ordinary witness. But you should consider the expert's experience and qualifications in the specific area.

Expert witnesses are allowed to render opinions, and those opinions are only allowed if they're helpful to you, the fact finder. But again, bear in mind that you have the ultimate determination as to a conclusion about the issues in the case.

An expert cannot tell you that he thinks a crime occurred, because that's not helpful to you, because you have to decide that. An expert witness cannot tell you that a witness is lying or truthful, or he cannot even tell you that a crime occurred. Because you have to decide that based on all the evidence, and only the evidence, that's been presented in the courtroom. Do you understand that?

[Affirmative responses from the Members]

To the extent that Dr. Stuemky opined that he thought a crime occurred, and that a particular specific person committed that crime, you cannot consider that, because that's not helpful to you. You have to make that decision. Do you understand that?

[Affirmative responses from the Members]

As I told you earlier this morning, there's nobody that can help you in that regard, because you have to make your decision based on the evidence that's presented to you here in court. Nobody else has the unique situation of being

present to hear all the evidence in court. Do you understand what I'm telling you?

[Affirmative responses from the Members]

I'm telling you that you must disregard any testimony about whether a crime occurred, or whether this soldier committed a crime. Do you understand that?

[Affirmative responses from the Members]

And you can't consider that for any reason during your deliberations. Do you understand that?

[Affirmative responses from the Members]

I've gotten affirmative responses by every member to this point.

You can consider evidence that certain – as to an opinion about whether injuries were consistent with SIDS or not consistent with SIDS, or whether injuries were consistent with a child abuse-type death. But you cannot consider any testimony as to what this witness thought as to who did it. Do you understand that?

The members indicated they would follow the instructions. The judge then individually questioned each member as to whether they could comply with the instructions. Every member indicated that they would follow the instructions. At this point, without other comment or ruling, the judge denied the defense motion for a mistrial.

However, this matter of Dr. Stuemky's testimony was not closed. While the members were deliberating, assistant defense counsel made the following request of the judge:

I'd ask the court to recall Dr. Stuemky to testify outside the presence of the members as to why he intentionally disregarded a warning of the court and went beyond permissible testimony. I thought about this last night, Your Honor, and there's really only two possibilities, either he wasn't warned or he deliberately ignored that warning. [Government Counsel] has represented to the court -- and I have no

> reason to doubt it -- that he warned Dr. Stuemky.  If Dr. Stuemky deliberately ignored a warning of the court, the court ought to consider whether or not he is in contempt.  I think he ought to be recalled for this purpose and he should be called to explain why he ignored explicit instructions from the court.

The military judge denied this request.  After deliberating for almost six hours, the members convicted Appellant of both offenses.

### IV.  DISCUSSION

### A.  The error

The authority of expert testimony is well established. Judge Wiss, speaking for this Court, identified the general parameters in the evidentiary rules for the admissibility of expert testimony.

> Liberal standards for admissibility of expert testimony have been codified. [M.R.E.s] 702-05.  Trial courts have seen, therefore, a veritable explosion in use of expert testimony.  Our Court is concerned with the so-called "battle of the experts," which is a waste of time, unnecessary, or confusing. [M.R.E.] 403 is the appropriate tool for a military judge to use to handle this problem.
>
> [M.R.E.s] 702-705 and 403 operate to establish a simple four-part test for admissibility of expert testimony: (1) Was the witness "qualified to testify as an expert"? (2) Was the testimony "within the limits of [the expert's] expertise"? (3) Was the "expert opinion based on a sufficient factual basis to make it relevant"?, and (4) "Does the danger of unfair prejudice created by the testimony outweigh its probative value?"

United States v. Banks, 36 M.J. 150, 160-61 (C.M.A. 1992)(citations and footnotes omitted).  These rules reflect the intuitive idea that experts are neither omnipotent nor omniscient.

An expert witness may not opine concerning the guilt or innocence of the accused.  See United States v. Birdsall, 47 M.J.

404, 409 (C.A.A.F. 1998); United States v. Cacy, 43 M.J. 214, 217 (C.A.A.F. 1995); United States v. Suarez, 35 M.J. 374, 376 (C.M.A. 1992); United States v. Meeks, 35 M.J. 64 (C.M.A. 1992). The analysis to M.R.E. 704 expressly states, "The Rule does not permit the witness to testify as to his or her opinion as to the guilt or innocence of the accused . . . ." Manual for Courts-Martial, United States (2002 ed.), Analysis of the Military Rules of Evidence A22-50.

The limits on expert opinion are rooted in recognition that the expert lacks "specialized knowledge" to determine if the victim or witness is telling the truth and respect for the member's exclusive function to weigh evidence and determine credibility. See Birdsall, 47 M.J. at 410. The position of this Court on these limitations is consistent with well-established practice in federal civilian trial courts. Id.

The admonition we have provided in the prosecution of child sexual abuse cases is equally applicable to the use of all experts: "When using the testimony of expert witnesses . . ., trial practitioners 'must walk a fine line.'" Cacy, 43 M.J. at 217-18 (citation omitted). Condemning impermissible expert opinion, this Court stated that such testimony that opines that a crime has been committed and that a particular person did it "crosses the line of proper medical testimony." Birdsall, 47 M.J. at 410 (error to opine that sons were "victims of incest by their father").

It is clear to this Court, as it was to the trial judge and the lower court, that the testimony of Dr. Stuemky was improper when he opined that Nicole was the victim of a homicide and that

Appellant was the perpetrator. Diaz, 56 M.J. at 801. Dr. Stuemky improperly testified as to his opinion of the guilt of Appellant. Likewise, it is clear to this Court, as it was to the military judge when he delivered his limiting instruction following Ms. Amlin's testimony, that her testimony was improper to the extent that it implied her belief that Appellant murdered Nicole. This testimony usurped the panel's exclusive function to weigh evidence and determine guilt or innocence. See id.

### B. The remedy

In light of this error, the decisional issue before this Court is the remedy: Could the trial proceed with a curative instruction addressing Dr. Stuemky's testimony, or was either a full or partial mistrial a necessary remedy? In this context, we focus on the more egregious error resulting from Dr. Stuemky's testimony, and we consider the error as to Ms. Amlin's testimony in terms of its impact on the prejudice from Dr. Stuemky's testimony.

Rule for Courts-Martial 915 (Mistrial) [hereinafter R.C.M.], states in part:

> (a) In general. The military judge may, as a matter of discretion, declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings. A mistrial may be declared as to some or all charges, and as to the entire proceedings or as to only the proceedings after findings.

The discussion to R.C.M. 915(a) cautions that,

> The power to grant a mistrial should be used with great caution, under urgent circumstances, and for plain and obvious reasons. As examples, a mistrial may be appropriate when inadmissible

24

> matters so prejudicial that a curative instruction would be inadequate are brought to the attention of the members[.]

In United States v. Dancy, 38 M.J. 1 (C.M.A. 1993), this Court recognized that a mistrial is an unusual and disfavored remedy.  It should be applied only as a last resort to protect the guarantee for a fair trial.  We explained:

> Declaration of a mistrial is a drastic remedy, and such relief will be granted only to prevent manifest injustice against the accused.  It is appropriate only whenever circumstances arise that cast substantial doubt upon the fairness or impartiality of the trial.

Id. at 6 (citations and internal quotes omitted).

A military judge has "considerable latitude in determining when to grant a mistrial."  United States v. Seward, 49 M.J. 369, 371 (C.A.A.F. 1998).  This Court will not reverse the military judge's decision absent clear evidence of abuse of discretion.  Dancy, 38 M.J. at 6; United States v. Rushatz, 31 M.J. 450 (C.M.A. 1990).  Our deference to the military judge's decision on a mistrial is consistent with other federal practice addressing this matter as reflected in this statement by the First Circuit:

> [T]he trial court has a superior point of vantage, and . . . it is only rarely — and in extremely compelling circumstances — that an appellate panel, informed by a cold record, will venture to reverse a trial judge's on-the-spot decision . . . .  [A] mistrial is viewed as a last resort, only to be implemented if the taint is ineradicable, that is, only if the trial judge believes that the jury's exposure to the evidence is likely to prove beyond realistic hope of repair.

United States v. Freedman, 208 F.3d 332, 339 (1st Cir. 2000) (citations and internal quotes omitted).

The challenge for both the trial judge and the appellate court is to determine the prejudicial impact of an error. In United States v. Pastor, Judge Cook focused on the difficulty of this task stating,

> Assessment of the probable impact of inadmissible evidence upon the court members is always difficult. Sometimes an instruction to disregard the inadmissible evidence is sufficient assurance that it will not be weighed against the accused; other times the nature of the evidence is such that it is not likely to be erased from the minds of the court members. Each situation must be judged on its own facts.

8 M.J. 280, 284 (C.M.A. 1980). Judge Cook concluded that this judgment is rooted in a simple "tolerable" risk assessment that the members would be able to put aside the inadmissible evidence. Id.

In the present case, the judge denied the defense motion for a mistrial without stating on the record his findings of fact or legal analysis to support this ruling. However, the judge's actions in giving a curative instruction and conducting individual voir dire reveal that he concluded that this remedial action was sufficient to ensure that the members would be able to put aside the inadmissible evidence.

Considering the facts of this case, we conclude that the military judge abused his discretion in his ruling that the remedial action was sufficient and in refusing to declare a mistrial. The significance of this error is best revealed by examining why a mistrial was necessary as to each charged offense -- the murder of Nicole and the aggravated assault of Jasmine.

### 1.  Mistrial as to alleged murder of Nicole

#### a.  Prejudicial impact of the inadmissible evidence

First, the judge misapprehended the prejudicial impact of Dr. Stuemky's inadmissible testimony.  The two central issues as to Nicole's death were the cause of her death (homicide or natural causes) and, if homicide, the identity of the perpetrator.  The prosecution asserted that Appellant murdered Nicole by suffocation, relying primarily on the fact that Appellant was alone with Nicole when she died and that Appellant said she was not breathing when he got up from the couch.  In his pretrial statements, Appellant adamantly and repeatedly denied any culpability in her death.  The defense argued that Nicole's death was the possible result of SIDS.

Dr. Stuemky was the key prosecution witness regarding both these issues.  Because of his unique position at Children's Hospital and his involvement with Nicole's case over several years, Dr. Stuemky's testimony was important in both breadth and depth.  He opined that Nicole did not die a natural death, but that her death was a homicide.  He based this conclusion on his findings that her death was consistent with child abuse, inconsistent with SIDS, and that the autopsy report was consistent with the conclusion that she had been suffocated.  He also expressly identified Appellant as the perpetrator.

The significance of his improper testimony is clear from several factors.  Dr. Stuemky had a unique, authoritative role in this case as an expert witness.  His extensive experience and multifaceted career in academia and medical practice, as well as

his positions on the Child Protection Committee and the Death Review Board, bolstered his credibility. He was the principal expert witness to establish the alleged pattern of abuse and to rebut the defense argument that Nicole possibly died of SIDS. Finally, the trial counsel repeatedly relied on Dr. Stuemky's testimony in opening statement and initial and rebuttal closing arguments. Building upon Dr. Stuemky's credentials and involvement in the case, trial counsel used his testimony to provide details of injuries and abuse, to explain Nicole's death, and to establish a pattern of Appellant's abuse of his daughters.

We reject the lower court's assertion that "there is less to Dr. Stuemky's statement than might appear at first blush." Diaz, 56 M.J. at 802. The lower court reasoned that identity of the perpetrator was not an issue in this case because of Appellant's pretrial admissions that he was alone with Nicole when she died. The court further noted that Dr. Stuemky's opinion was based on the fact that Nicole did not die of natural causes. Id. Dr. Stuemky's testimony identifying Appellant as a perpetrator violated a fundamental rule of law that experts may not testify as to guilt or innocence. His testimony was particularly egregious as the defense filed a motion to exclude this testimony, the judge expressly ruled that this testimony was improper, and trial counsel stated he had informed the witness of the judge's ruling to limit the witness's testimony.

As the cause of Nicole's death was a threshold issue before the panel, Dr. Stuemky's identifying Appellant as the perpetrator could be viewed by the members as bolstering his assertion that she was murdered and did not die a natural death. See United

States v. Boyd, 55 F.3d 667, 672 (D.C. Cir. 1995)("[T]he jurors may rely on the purported expertise of the Government witness to cure the ambiguity that they face . . . . There would be little need for a trial before a jury if an expert is allowed simply to declare the defendant's guilt."). Dr. Stuemky's testimony was presented as a definitive resolution of the issues of both cause of death and identity of the perpetrator. In this homicide prosecution, the prejudicial impact of linking these two issues was immediate, direct, and powerful, as it was an impermissible expert opinion of Appellant's guilt.

Second, the judge failed to consider adequately the context of Dr. Stuemky's impermissible expert testimony. Dr. Stuemky's inadmissible opinion testimony immediately followed the testimony of Ms. Amlin that she "was convinced that he killed his daughter." Although the judge instructed the panel not to consider her belief that Appellant committed a crime, we consider the juxtaposition of Dr. Stuemky's inadmissible testimony and Ms. Amlin's testimony to have had a cumulative prejudicial impact on the panel. Regarding the other defense challenges to the admission of Ms. Amlin's testimony, we have assumed without deciding, only for purposes of this appeal, that her testimony was otherwise admissible.

### b. Inadequacy of the curative instruction

In light of these trial developments, we reject the judge's implicit ruling that a curative instruction could purge prejudice from this error. After Dr. Stuemky identified Appellant as the murderer, the judge made a futile attempt to "unring the bell." See United States v. Armstrong, 53 M.J. 76, 82 (C.A.A.F. 2000)

(citations omitted). A curative instruction is the preferred remedy, and the granting of a mistrial is an extreme remedy which should only be done when "inadmissible matters so prejudicial that a curative instruction would be inadequate are brought to the attention of the members." R.C.M. 915(a) discussion. Recently, this Court stated, "We have often held that a curative instruction can render an error harmless." Armstrong, 53 M.J. at 82 (citations omitted). However, in United States v. Rosser, this Court reaffirmed that a curative instruction is not a perfunctory exercise, stating:

> It is clear that the mantle of judicial discretion will not protect a decision based on the judge's arbitrary opinions as to what constitutes a fair court-martial. Likewise, the military judge must engage in a sufficient inquiry as a matter of law to uncover sufficient facts to decide the issue before him.

6 M.J. 267, 271 (C.M.A. 1979). We encourage voir dire to ensure the members not only understand but also will adhere to the curative instructions. Under some circumstances, however, an instruction followed by voir dire of the members does not cure the prejudice toward the accused and the judge must grant a mistrial. In such instances, the judge's failure to do so is an abuse of discretion.

Here, as in Armstrong, we have "grave doubts" about the military judge's ability to "unring the bell." We view the instructions regarding the inadmissible evidence as both inadequate and confusing. Also, we do not consider that the Government's case was as strong as asserted by the lower court.

The instruction was inadequate and confusing in several facets. Given the inflammatory nature of Dr. Stuemky's impermissible testimony, the military judge should have immediately instructed the members regarding the impropriety of Dr. Stuemky's testimony that Nicole was murdered and that Appellant was the perpetrator. Instead, the military judge then surrounded his admonition not to consider Dr. Stuemky's impermissible testimony with an instruction telling the members how powerful expert testimony is and an explanation that the impermissible portion of Dr. Stuemky's testimony was "not helpful." In this context, the impact of the military judge's admonition not to consider the impermissible portion of Dr. Stuemky's testimony was significantly diluted.

Furthermore, the instruction was confusing because it failed to provide proper guidance for the panel's deliberations. We note that the instruction was inconsistent with the prior ruling of the judge as to the scope of Dr. Stuemky's testimony. Initially, the judge ruled, outside of the presence of the members, that Dr. Stuemky could testify that Nicole's death was a homicide. He also ruled that Dr. Stuemky could testify that the injuries were caused by child abuse. However, when the judge provided the curative instruction to the members, the judge stated that Dr. Stuemky could not opine that a crime occurred. In light of the judge's ruling and the testimony at trial, the judge had an obligation to be specific and precise. His failure to do so here rendered the instruction ineffective. See United States v. Jackson, 6 M.J. 261, 263 n.5 (C.M.A. 1979); United States v. Groce, 3 M.J. 369, 370-71 (C.M.A. 1977).

31

Finally, we doubt the efficacy of the curative instruction. Instructed contemporaneously with the testimony of Ms. Amlin and Dr. Stuemky, the panel was given a confusing mixed signal. Despite instructions that witnesses could not testify that the accused committed a crime, the panel heard both witnesses plainly identify Appellant as the perpetrator of a murder. The members could hardly appreciate the gravity of the error or the importance of the limiting instructions where it appeared that such testimony was permissible. There are situations where the judge can "unring the bell" but we do not believe he did so in this instance.

### c. Consideration of other evidence
### including the uncharged misconduct

We do not evaluate these trial developments in a vacuum, but are compelled to consider all the evidence in measuring the impact of any error. Accordingly, we next consider all the evidence in the process of evaluating whether the limiting instructions provided an adequate remedy. See United States v. Weeks, 20 M.J. 22, 25 (C.M.A. 1985).

Although Appellant asserted he was alone with Nicole at the time of her death, in his pretrial statements Appellant repeatedly denied his culpability. There were no eyewitnesses to Nicole's death. There was no forensic evidence that directly implicated Appellant in the death of the child. The autopsy report listed the cause of death as unknown.

The prosecution's case was built on circumstantial evidence. The linchpin of this case was the prosecution's strategy to establish a pattern of abuse by Appellant against his infant

daughters.  The lower court also relied on the "doctrine of chances" as a theory to implicate Appellant.  See Diaz, 56 M.J. at 802 (quoting United States v. Tyndale, 56 M.J. 209, 213 (C.A.A.F. 2001)(it "is unlikely a defendant would be repeatedly, innocently, involved in similar, suspicious circumstances.")).  To support this pattern of abuse theory, the prosecution relied upon prior acts of uncharged misconduct relating to injuries to Nicole.  Therefore, we will carefully examine the uncharged misconduct evidence.

Recently, in United States v. Humpherys, this Court summarized the legal requirements and test for the admissibility of uncharged misconduct stating in part:

> "[E]vidence which is offered simply to prove that an accused is a bad person is not admissible" under [M.R.E.] 404(b), Manual for Courts-Martial, United States (2000 ed.).  United States v. Reynolds, 29 MJ 105, 109 (CMA 1989).  [M.R.E.] 404(b), however, is a rule of inclusion, not exclusion.  "[T]he sole test under [M.R.E.] 404(b) is whether the evidence of the misconduct is offered for some purpose other than to demonstrate the accused's predisposition to crime . . . ."  United States v. Tanksley, 54 MJ 169, 175 (2000)(quoting United States v. Castillo, 29 MJ 145, 150 (CMA 1989)). As the Supreme Court stated when speaking of [M.R.E.] 404(b)'s counterpart, Fed.R.Evid. 404(b): "The threshold inquiry a court must make before admitting similar acts evidence under Rule 404(b) is whether that evidence is probative of a material issue other than character." Huddleston v. United States, 485 U.S. 681, 686, 108 S.Ct. 1496, 99 L.Ed. 2d 771 (1988).  In addition to having a proper purpose, the proffered evidence must meet the standards of [M.R.E.] 104(b), 402, and 403. See Reynolds, 29 MJ at 109.

> Reflecting the combined requirements of these rules, our Court applies a three-pronged test for determining admissibility of other-acts evidence under [M.R.E.] 404(b).  See id.  We evaluate: (1) whether "the evidence reasonably supports a finding by the court members that appellant committed prior crimes, wrongs or acts"; (2) "[w]hat fact of consequence is made more or less probable by the

existence of this evidence"; and (3) whether "the probative value [is] substantially outweighed by the danger of unfair prejudice[.]" Id. (internal quotations, ellipses, and citations omitted); see also Tanksley, 54 MJ at 176-77. "If the evidence fails any of the three tests, it is inadmissible." United States v. Cousins, 35 MJ 70, 74 (CMA 1992); accord Reynolds, 29 MJ at 109.

57 M.J. 83, 90-91 (C.A.A.F. 2002) (footnote omitted).

The uncharged misconduct evidence related to alleged abuse of Nicole and included leg and rib fractures, bruises, and the burn to her face. Under the three-pronged test set forth in Reynolds, we hold that the military judge abused his discretion by admitting all the uncharged misconduct. Under the circumstances of the case, the prejudice from this error exacerbated the prejudice from Dr. Stuemky's testimony.

The trial evidence was insufficient to establish that Appellant inflicted the leg and rib fractures and the bruise to Nicole's chest. There is minimal evidence to establish when and how Nicole suffered the fractured ribs, broken leg, and the bruise to her chest. Also, there was no evidence to establish who was culpable for the injuries. While Appellant had access to Nicole, he was by no means the only one with the opportunity to inflict these injuries. Appellant's wife was the primary caregiver and testified that other people had access to Nicole, including several babysitters and Appellant's younger brother. The Government's written response to the defense motion to suppress this evidence effectively conceded the lack of proof to implicate Appellant in those injuries. Trial counsel stated, "Evidence of the broken bones and bruises is not being offered to show that the accused actually caused these injuries, but to

explain the reasoning behind Dr. Stuemky's opinion that Nicole was an abused child."  In essence, we view all the factors relied on by the prosecution as "rather generic" rather than "highly probative of identity."  See United States v. Ferguson, 28 M.J. 104 (C.M.A. 1989).

We recognize that "when the crime is one of infanticide or child abuse, evidence of repeated incidents is especially relevant because it may be the only evidence to prove the crime." United States v. Woods, 484 F.2d 127, 133 (4th Cir. 1973). However, there must be sufficient evidence to establish Appellant's culpability regarding an incident of alleged misconduct in order to establish the relevance of that incident. Each alleged incident of uncharged misconduct must pass through the "Reynolds filter."  The prosecution cannot merely lump together a series of incidents and assert that together they establish Appellant committed each act of abuse.  Although the standard for the first prong of the test for admissibility of uncharged misconduct is low, we find that standard was not met here.  United States v. Browning, 54 M.J. 1, 6 (C.A.A.F. 2000). It was error to admit evidence regarding the broken bones and the bruise to Nicole's chest, as the evidence fails to meet the first prong of the Reynolds test.

Furthermore, regarding the uncharged misconduct of the burn to Nicole, we note that the defense supported its explanation of this incident as an accident by presenting testimony from the chairman and Chief Executive Officer of the vaporizer manufacturer.  He testified by stipulation that he had "received complaints from customers who were burned by the steam coming out

of one of [his company's] steam vaporizers. [He has] even burned [himself] several times accidentally by allowing [his] arm to go through the steam coming from a vaporizer."

We reject the prosecution's assertion that this incident is relevant under prong two of Reynolds to the charged offense of Appellant murdering Nicole. With regard to the murder charge, Appellant asserted that Nicole died from unexplained circumstances. Appellant did not assert that he had done any act that caused harm to Nicole. He did not assert either accident or mistake. Appellant's defense was a general denial.

The prosecution attempted to "create an act by Appellant," an accidental injury to Nicole, and then to rebut it by offering uncharged misconduct. The root of the problem with this prosecution strategy is that there was no fact of consequence or act of Appellant for the prosecution to rebut or explain. The prosecution was not permitted to "create an act by Appellant" and then to offer uncharged misconduct evidence to rebut or explain it. See United States v. Graham, 50 M.J. 56 (C.A.A.F. 1999). Simply stated, the prosecution cannot introduce uncharged misconduct to rebut a defense that was never raised or presented by the defense. Such evidentiary bootstrapping is not permitted. See United States v. Maxwell, 21 M.J. 229, 230 (C.M.A. 1986)("[T]he prosecution cannot turn a defense witness into a character witness through cross-examination and, thereby, bootstrap otherwise inadmissible evidence into the case.");

Ferguson, 28 M.J. at 109 ("Two bodies of otherwise inadmissible testimony cannot bootstrap each other into admissibility.").[3]

Finally, in light of the egregious error in Dr. Stuemky's testimony and the related error in Ms. Amlin's testimony, in the context of the prosecution strategy of relying on a pattern of abuse, we have grave doubt that the panel could separate and fairly consider the uncharged and charged misconduct. Under the prosecution theory, these events of uncharged and charged misconduct were inextricably intertwined. This draws into question whether a panel could disregard Dr. Stuemky's expert testimony that Appellant murdered Nicole but consider, for the proper purpose only, the uncharged evidence of Appellant's abusing her.

As a result of the exposure of the members to Dr. Stuemky's powerful expert testimony that Appellant murdered his daughter, we are left with grave doubt that the panel could fairly evaluate

---

[3] We disagree with the assertion in the separate opinion that this case is similar to Estelle v. McGuire, 502 U.S. 62 (1991). In our view, the nature, quantum, and quality of the evidence of intentional physical abuse in McGuire was significantly different from this case. Most importantly, McGuire is not a valid precedent for deciding an issue involving Military Rule of Evidence 404(b). McGuire involved a petition for habeas corpus. The Supreme Court specifically declined to decide whether the California courts correctly applied the rules of evidence, holding that review of the evidentiary question "is no part of a federal court's habeas review of a state conviction." 502 U.S. at 67. The only question addressed by the Supreme Court was whether the trial judge's ruling on the admissibility of "bad acts evidence" and the limiting instruction regarding that evidence "so infected the entire trial that the resulting conviction violated due process." Id. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). The Supreme Court resolved this narrow constitutional issue against the petitioner without deciding the evidentiary issue.

the uncharged misconduct evidence.  Simply stated, we believe that the panel's hearing Dr. Stuemky's testimony so fueled the prejudicial impact of the uncharged misconduct evidence that it rendered it inadmissible under the third prong of Reynolds. Accordingly, we hold that the evidence of uncharged misconduct was inadmissible for the purpose of showing a pattern of abuse. We express no opinion as to whether the evidence of prior uncharged acts might be otherwise admissible for another purpose at a rehearing.

Without the uncharged misconduct, the Government's case is substantially weakened.  Even assuming, however, that the prior acts evidence was admissible under M.R.E. 404(b), the strength of the Government's case remains questionable.  Therefore, our view of the entire case confirms our conclusion that it was error for the judge to deny the defense motion for a mistrial with regard to the alleged homicide.

2.  Mistrial as to alleged aggravated assault of Jasmine

The R.C.M.s specifically authorize a judge to declare a mistrial as to only some of the proceedings.  See R.C.M. 915. This Court also has sanctioned this remedy.  See Rosser, 6 M.J. at 270-71.  However, in the present case, we are not faced with the situation where the judge granted a partial mistrial and dismissed the murder charge.  On the contrary, Appellant's trial proceeded on both charged offenses.  Having concluded that a mistrial as to the murder charge was required, we are left with the question of whether the members could fairly decide whether Appellant committed an alleged aggravated assault by intentionally burning Jasmine.

As Appellant admitted burning Jasmine, the panel decision regarding this offense boiled down to one issue -- was the burn an intentional act or accident?  The focus of our inquiry, therefore, is how Dr. Stuemky's testimony labeling Appellant as Nicole's murderer impacted the panel's eventual decision.

As we evaluate the impact of Dr. Stuemky's testimony in the context of this case, as exacerbated by Ms. Amlin's improper testimony and by the evidence of uncharged misconduct, we again focus on the prosecution strategy to use both the charged and uncharged misconduct to establish a pattern of abuse by Appellant against his infant daughters.  While the record reveals this strategy permeated the prosecution's case, the primacy of this strategy is reflected in the opening line of the prosecutor's rebuttal argument, "Members of the panel, there is a pattern here."  Nowhere is this pattern of abuse strategy more evident than in this argument when assistant trial counsel responded to the defense assertion that there was no intentional assault of Jasmine.  Assistant trial counsel stated to the members, "Anyone of us can look at this picture and see the evidence of abuse [Prosecution Exhibit 10]."  To illustrate his point, trial counsel showed the members the picture of Nicole's burn, Prosecution Exhibit 10, rather than the picture of Jasmine's burn, Prosecution Exhibit 3.  This example illustrates how the prosecution interwove the two charged offenses and alleged uncharged misconduct to accomplish the prosecution strategy of establishing Appellant's pattern of abuse.

Similarly, the lower court recognized the prosecution's strategy and expressly relied on evidence of Appellant's pattern

of abuse to sustain the findings.  Diaz, 56 M.J. at 798.  The lower court's reliance on this evidence supports our view that the prosecution of these two offenses was inextricably intertwined.

Another important trial development we have considered was the improper testimony of Dr. Tremaine, with regard to Jasmine's burn, that Appellant was "listed as the prime perpetrator, or the perpetrator, of this non-accidental trauma."  The admission of this evidence was plain error.  See Birdsall, 47 M.J. at 409-10.  This error, in light of Dr. Stuemky's and Ms. Amlin's inadmissible testimony, further calls into question the fairness of this trial.  This fact of a third witness identifying Appellant as the perpetrator in the other charged offense, the burn to Jasmine, raises the question of how many times this Court will permit the prosecution to "ring the bell."  We simply conclude we cannot condone this error for a third time.

This inadmissible evidence from Dr. Stuemky, Dr. Tremaine, and Ms. Amlin magnified the impact of these errors on the members in a case where the panel requested clarifying instructions from the judge and deliberated on findings for almost six hours.  Each evidentiary error was significant, and together they denied Appellant a fair trial.  See Birdsall, 47 M.J. at 410 (plain error for expert to act as human lie detector); United States v. Garza, 608 F.2d 659, 664-66 (5th Cir. 1979)(it was plain error for the prosecutor to "testify" as an expert witness and opine in closing argument as to the guilt or innocence of the accused); but see United States v. Waldman, 310 F.3d 1074, 1078 (8th Cir. 2002)(where there was substantial evidence of guilt, no plain

error for expert to opine that accused "had an intent to kill a policeman.").

In making this decision, we again specifically consider if the uncharged misconduct relating to Nicole's burn and the other evidence implicating Appellant in Jasmine's burns render harmless any error in the admission of Dr. Stuemky's testimony. In so doing, we again conclude that the uncharged misconduct relating to Nicole's burn would be inadmissible. The panel's hearing Dr. Stuemky's testimony so exacerbated the prejudicial impact of the uncharged misconduct evidence relating to Nicole's burn that it rendered this evidence inadmissible under the third prong of Reynolds. Viewing the case as it was prosecuted, we find the circumstances and context of this serious error cast substantial doubt upon the fairness and impartiality of the trial. We are left with grave doubt that the members could fairly and impartially decide whether Appellant committed an alleged aggravated assault on Jasmine by intentionally burning her. This decision is rooted in our understanding of human nature and the purpose of a criminal trial. There are limits to what a panel can be expected to disregard. The human mind of a member is not a blackboard where the judge, by a curative instruction, can irrevocably erase powerful inadmissible evidence.

We do not believe that the members could have put out of their minds that three witnesses labeled Appellant guilty of the charged offenses. While we have acknowledged the evidence implicating Appellant, we reaffirm that guilt is established only by a fair trial. In the present case, Appellant was denied a fair trial. A partial mistrial is not an appropriate remedy in

41

this case.  See United States v. Harriston, 329 F.3d 779, 789 (11th Cir. 2003).

In summary, we hold that the trial judge erred in not granting a mistrial as to both charged offenses.  Similarly, the Court of Criminal Appeals erred in affirming the findings and sentence.

## Decision

For these reasons, the decision of the United States Army Court of Criminal Appeals is reversed.  The findings and sentence are set aside.  A rehearing is authorized.

Appendix A



## Chronology

25 Nov 92 — Nicole Born - Fort Sill

23 Jan 93 — Nicole Burn

26 Jan 93 - 8 Jun 93 Foster Care with Harshaws

8 Jun 93 - 5 Nov 93 Foster Care with Myers

5 Nov 93 — Nicole returned to Parents

11 Feb 94 — Nicole pronounced dead

5 Jan 95 — Jasmine Born - Hawaii

30 Jul 95 — Jasmine Burn

13-18 Oct 95 — SCAN; Jasmine Removed from Home

A true reproduction of the actual exhibit. Attest:

ELIZABETH D. MONEYMAKER
CPT, JA
Trial Counsel

Appellate Exhibit XXIV
R.207

43

<u>United States v. Diaz</u>, No. 02-0513/AR

CRAWFORD, Chief Judge (concurring in part and dissenting in part):

## Introduction

To reach its desired result on the key issue, the majority concludes that all the evidence of Appellant's prior abuse of Nicole was inadmissible under Military Rule of Evidence 404(b) [hereinafter M.R.E.]. Yet <u>Huddleston v. United States</u>, 485 U.S. 681 (1988), and <u>Estelle v. McGuire</u>, 502 U.S. 62 (1991), make clear that M.R.E. 404(b) is a rule of inclusion, not a rule of exclusion, and that under this rule, the evidence of Appellant's prior abuse of Nicole was admissible.

In <u>Huddleston</u>, the Court noted:

> Article IV of the Rules of Evidence deals with the relevancy of evidence. Rules 401 and 402 establish the broad principle that relevant evidence — evidence that makes the existence of any fact at issue more or less probable – is admissible unless the Rules provide otherwise.

485 U.S. at 687. The Court also quoted the Rules Advisory Committee, which

> specifically declined to offer any "mechanical solution" to the admission of evidence under 404(b). Rather, the Committee indicated that the trial court should assess such evidence under the usual rules for admissibility: "The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other factors appropriate for making decisions of this kind under Rule 403."

Id. at 688 (citations omitted).  The majority, however, ignores

and distorts Huddleston, as well as McGuire, with the end result

that future child abuse prosecutions may now be more difficult

in the military justice system than in the civilian criminal

justice system.

Even so, I agree with the majority that it was error for

Dr. Stuemky to testify -- contrary to the military judge's

express instructions -- that he believed Appellant killed

Nicole.  Likewise, I also agree that to the extent Ms. Amlin

similarly testified, that too was error.[1]  See United States v.

Douglas, 57 M.J. 270, 271-72 (C.A.A.F. 2002)(unclear if military

judge's redaction order was followed by counsel).  Unlike the

majority, however, I conclude these errors did not substantially

influence the members' findings of guilty in light of: (1) the

undisputed facts surrounding Nicole's death; (2) the admissible

portions of Dr. Stuemky's and other expert testimony concerning

the cause of Nicole's death; (3) the admissible evidence of

Appellant's prior abuse of Nicole and subsequent abuse of

Jasmine; (4) Appellant's admissions to Ms. Amlin and his

resulting loss of credibility; and (5) the military judge's

---

[1] Throughout this opinion, I speak only in terms of Dr. Stuemky's improper testimony.  Nonetheless, to the extent others also testified improperly, I find that harmless too, for the same reasons I find Dr. Stuemky's improper testimony harmless.

curative instructions.  See United States v. Armstrong, 53 M.J. 76, 81 (C.A.A.F. 2000)(expert testimony that an accused committed charged acts of abuse is error tested for harmlessness); United States v. Charley, 189 F.3d 1251 (10th Cir. 1999)(harmless error when several experts testified that sexual abuse actually occurred or premised their testimony on fact of actual abuse).

For these reasons, I respectfully dissent.

## Undisputed Facts

At trial and on appeal, the Government and Appellant agreed on every fact surrounding Nicole's death -- except one. Specifically, they both agreed that Appellant retrieved Nicole from her crib and brought her into the living room.  They both agreed Appellant's wife was asleep in her bedroom at the time. They both agreed Appellant laid Nicole across his lap as he sat on the sofa.  They both agreed she was alive at the time.  They both agreed no one else was in the room besides Nicole and Appellant.  And they both agreed that Nicole passed from life to death as she laid there in Appellant's lap.

The only thing they disagreed on was whether Nicole died innocently of natural causes as she laid in Appellant's lap, or whether she died maliciously through suffocation as she laid in

Appellant's lap.  Either way, however, she died at the hands of Appellant, and that was not, and is not, in dispute.

### Dr. Stuemky's Inadmissible Testimony

Dr. Stuemky was asked by the prosecutor: "Did you come to any conclusion with regard to your review of Nicole's death[.]" In response, and contrary to express instructions from the prosecutor at the request of the military judge, Dr. Stuemky testified that "this was a homicide death . . . a physical abuse death.  And furthermore, I felt that the perpetrator was the father."

The express instructions he received were that he could opine only that the death was "consistent with child abuse," and had he limited himself in that way, there would have been nothing objectionable about his testimony.  See Charley, 189 F.3d at 1264 (no abuse of discretion allowing expert to "express an opinion that the evidence is consistent or inconsistent with the victim's allegations of sexual abuse"); United States v. Birdsall, 47 M.J. 404, 409 (C.A.A.F. 1998)(quoting United States v. Whitted, 11 F.3d 782, 785 (8th Cir. 1993))("A doctor can also summarize the medical evidence and express an opinion that the evidence is consistent or inconsistent with the victim's allegations of sexual abuse.").

Before this Court, Appellant argues in Granted Issues I and II that he was materially prejudiced by Dr. Stuemky's improper testimony, and that the military judge erred in not granting the requested mistrial. The majority agrees. I, however, do not.

## Discussion

As a starting point, I note that Dr. Stuemky's improper testimony consisted of two parts. The first was a conclusion that in his opinion, "this was a homicide death . . . a physical abuse death." The second was a conclusion that "the perpetrator was the father." Importantly, however, given the undisputed facts in this case, the second part of Dr. Stuemky's testimony (that Appellant was the killer) was superfluous because it added nothing to what he already said with the first part of his improper testimony (that the death was a homicide). Everyone agreed, including the defense, that Nicole died while in Appellant's hands and in the presence of no one else. Thus, identity was never an issue, and neither was the following, undisputed reality: If Nicole's death was a homicide, it was Appellant who killed her.

That being the case, once Dr. Stuemky testified that Nicole's death was a homicide, all the damage (if any) was done, and no additional prejudice could result from his subsequent testimony that Appellant was the one who killed her. That

5

testimony was nothing more than a redundancy, stating merely the sole and obvious conclusion that flowed from the undisputed facts in this case.  Thus, it appears that it is a majority of this Court, not the military judge or the court below, that "misapprehend[s] the prejudicial impact of . . . [the] inadmissible testimony" by treating the issues of homicide and identity as co-equal in this case.  __ M.J. at (27-29).  They are not co-equal.  They are one and the same.

Properly narrowed, Granted Issue I asks only whether Dr. Stuemky's single, impermissible statement that Nicole's death was a homicide -- as opposed to the permissible statement that her death was consistent with child abuse -- substantially influenced the members' finding of guilty.  In light of the other evidence in this case, Appellant's complete lack of credibility, and the military judge's curative instructions, I conclude that it did not, and that as a result, the military judge did not abuse his discretion by not granting a mistrial (Granted Issue II).

### Dr. Stuemky's and Other Admissible Expert Testimony on the Cause of Death

As a member of Oklahoma's Child Death Review Board, Dr. Stuemky performed a thorough review of the circumstances surrounding Nicole's death.  That review led him to the

6

following conclusions, to which he testified at trial: (1) there was no "biological, anatomical, or toxicological" cause of Nicole's death; (2) Nicole was "way beyond" the age of Sudden Infant Death Syndrome (SIDS); (3) as a result, her death was not a "natural cause" death; and (4) her death was "consistent with suffocation."

Specifically, Dr. Stuemky testified that SIDS is "defined by the National Institutes of Health [(NIH)] in this country as simply a sudden, unexplained death in an infant under 12 months of age in whom an autopsy has in fact been performed, and no other causes or abnormalities are noted[.]"  He further testified as follows regarding SIDS:

> Twelve months – the absolute outer limits of 12 months was endorsed by the NIH.  SIDS is primarily an event that occurs in infants under 6 months of age.  Ninety percent of SIDS deaths are under 6 months of age, with the peak time of SIDS deaths between 2-4 months of age.  SIDS is, very interestingly enough, uncommon in the first month of life.  It's not until after the first month of life that one begins to see SIDS deaths.  By 6 months of age, 90 percent of all SIDS deaths have occurred that you're going to see. Indeed, many people have felt that one shouldn't call a SIDS death beyond 6 months of age.  But the NIH finally felt that the consensus should be that the absolute, outer time limit for labeling a SIDS death was 12 months of age.

(Emphasis added.)  Nicole, of course, was 14 months old when she died, which Dr. Stuemky testified was "very significant," because in the absence of a biological, anatomical,

7

toxicological, or other identifiable cause of death, "we would not consider this a natural cause of death . . . . And our concern is that it's most likely consistent with suffocation."

Dr. Stuemky then made the following observation, which every member of Appellant's court-martial must also have known through common sense and common experience: "Children just don't die suddenly laying on a parent's lap." Certainly a reasonable and experienced member of society knows that a healthy 14-month-old child -- "way beyond" the age of SIDS -- does not just die without a cause. That is why I conclude on this record that notwithstanding Dr. Stuemky's inadmissible testimony, the members would still have convicted Appellant based on the strength of Dr. Stuemky's admissible testimony, and the other admissible evidence and testimony.

Part of that other evidence and testimony came from Dr. Balding, the medical expert who performed the autopsy on Nicole, which he described as entailing the "opening of the body with surgical incisions, including the head and examination of the brain and all of the major internal organs. Again, this is done to look for evidence of injury or disease. At this time also, we take specimens such as blood, urine, or any other bodily fluids which can be used for later drug analysis; that sort of thing. Also at this time, postage stamp-sized pieces of the

major organs; these are then processed and examined under the microscope at a later time." Based on this autopsy, Dr. Balding testified Nicole's heart, lungs, kidneys, and thyroid were all "normal," and that "as far as the internal organs go, there was no evidence of injury or natural disease." He also testified that Nicole's brain was "normal" and "there was no evidence of injury or disease to the brain."

As for the toxicological screen that was conducted, he testified that "it was essentially negative, except there was brompheniramine, which is an over-the-counter cold medication [Dimetapp]. It was a very small amount that was present. . . . [I]t was negative in terms of having any relation to causing the death." Dr. Balding also testified there was no anatomical cause of death and he "could find no cause of death of Nicole," but that the autopsy results were consistent with suffocation.

### Appellant's Prior Abuse of Nicole and Subsequent Abuse of Jasmine

Death by suffocation as opposed to SIDS was also consistent with Appellant's prior and subsequent abuse of his children, which was "proximate in time" to Nicole's death and, along with the other evidence in this case, "established that [Appellant] had both the inclination and the opportunity" to seriously harm

Nicole.  See Charley, 189 F.3d at 1271 (discussing relevance of
defendant's prior abuse of victim).

It is here, however, that several of the other Granted
Issues dovetail, because a good deal of the evidence of these
other instances of abuse came from statements Appellant made to
medical and social work personnel -- statements Appellant argues
were inadmissible because (1) these people did not read him his
rights before questioning or counseling him, and (2) he was
coerced into making some of the statements.  I therefore address
these arguments first, before further addressing the relevance
and admissibility of Appellant's prior abuse of Nicole and
subsequent abuse of Jasmine.

### Questioning by Captain (CPT) Tremaine

On October 13, 1995, Appellant's nine-month-old daughter
Jasmine was referred to CPT Tremaine by Hawaii Child Protective
Services for evaluation of a three-month-old burn located on her
left inner thigh.  The evaluation was part of a Suspected Child
Abuse and Neglect (SCAN) work-up, and included CPT Tremaine
questioning both Appellant and his wife about the burn to help
him determine whether it resulted from an accidental or non-
accidental cause.  In addition, CPT Tremaine closely examined
the burn and conducted many other medical tests over almost a

week's time in order to properly diagnose the cause of Jasmine's injury.

Regarding the need for and importance of determining whether the cause of the burn was accidental or non-accidental, CPT Tremaine testified as follows:

Our main concern as the physician is – we are the physician of that child.  It is our job to protect that child.  So in establishing the diagnosis of non-accidental versus accidental trauma, we are, in essence, protecting that child from potential future events.

. . . .

It has important bearing on the child.  Children who are subject to non-accidental trauma are at greater risk for future episodes of non-accidental trauma.  That has been proved over and over again.  The only effective way to treat that is removal of the child from the house, or from the potential abusive situation.

CPT Tremaine also testified that questioning parents about the causes and extent of their children's injuries was standard operating procedure, regardless of "whether it's a diagnosis of alleged child sexual abuse, or some other injury or disease[.]"

Turning to CPT Tremaine's actual questioning of Appellant, CPT Tremaine did not read Appellant his rights beforehand, but he did inform Appellant "[t]he purpose was for a SCAN work-up . . . a 'Suspected Child Abuse and Neglect' work-up . . . to establish a diagnosis and find out if there was accidental or

non-accidental trauma done[.]"  Moreover, although law enforcement officers in plain clothes arrived after CPT Tremaine began questioning Appellant, they only did so because as a matter of protocol, they were notified a SCAN work-up was underway; they never entered the room where CPT Tremaine and Appellant were; they never questioned Appellant; they never communicated with CPT Tremaine during the questioning; and they never gave CPT Tremaine questions to ask Appellant.

In these circumstances, Appellant agreed to answer CPT Tremaine's questions, and the statements he provided were used against him at his court-martial over the defense's objection. The specific content of those statements I discuss more fully infra.  For now, all that is needed is to decide whether CPT Tremaine was required to read Appellant his rights under Article 31, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. § 831 (2000), before questioning him.  Appellant argues in Granted Issue III that CPT Tremaine was so required, and that as a result, Appellant's statements to him were inadmissible. Appellant is mistaken.

## Article 31(b) Warnings

Article 31(b) provides:

> No person subject to [the UCMJ] may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of

12

the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

The rationale behind Congress's passage of Article 31(b) was recently discussed in United States v. Swift, 53 M.J. 439, 445 (C.A.A.F. 2000), where we observed:

In the armed forces, a person learns from the outset of recruit training to respond promptly to the direct orders and the indirect expectations of superiors and others, such as military police, who are authorized to obtain official information. Failure to respond to direct orders can result in criminal offenses unknown in civilian life . . . .

In such an environment, a question from a superior or investigator is likely to trigger a direct response without any consideration of the privilege against self-incrimination. The Article 31(b) warning requirement provides members of the armed forces with statutory assurance that the standard military requirement for a full and complete response to a superior's inquiry does not apply in a situation when the privilege against self-incrimination may be invoked.

See also United States v. Harvey, 37 M.J. 140, 143 (C.M.A. 1993).

Thus, although by its terms, Article 31 seems to apply to all questioning of suspects and accuses by individuals subject to the UCMJ,[2] applying the rationale behind Article 31(b), our Court has held that "this statute requires warnings only when

---

[2] There is no question that CPT Tremaine was a person subject to the UCMJ.

questioning is done during an official law-enforcement investigation or disciplinary inquiry." United States v. Loukas, 29 M.J. 385, 387 (C.M.A. 1990). Consequently, many non-commanders and non-law enforcement personnel are not required to administer Article 31(b) warnings before questioning service-members. See, e.g., United States v. Raymond, 38 M.J. 136 (C.M.A. 1993)(psychiatric social worker); United States v. Moreno, 36 M.J. 107 (C.M.A. 1992)(state social worker); United States v. Pittman, 36 M.J. 404 (C.M.A. 1993)(section leader/ friend).

As a result, there is a long-standing principle that questioning by medical personnel for the sole purpose of diagnosis and treatment, even if a crime is suspected, does not need to be preceded by Article 31 warnings. See United States v. Bowerman, 39 M.J. 219, 221 (C.M.A. 1994)(although doctor suspected child abuse, questioning suspected parent without Article 31 warnings was permissible "to ascertain the facts for protective measures and curative purposes"); United States v. Fisher, 21 C.M.A. 223, 225, 44 C.M.R. 227, 279 (1972) (questioning by doctor for diagnosis not "within the reach of Article 31").

In Bowerman, "a seriously injured baby . . . 'was going down the tubes very quickly'" when the questioning took place.

In Fisher, the accused "was in immediate danger of suffering serious physical consequences" when he was questioned. Thus, in both cases, timing was important. Absent immediate knowledge of the cause of the injuries, effective treatment could be compromised.

In this case, there was no existing injury threatening Jasmine at the time CPT Tremaine questioned Appellant. Rather, the questioning took place as part of an evaluation of a three-month old burn. Nonetheless, rights warnings were still not required, because as the facts set forth above make abundantly clear, CPT Tremaine was not acting in a law enforcement or disciplinary capacity. To the contrary, he was acting solely on behalf of Jasmine, and solely in her best medical interests.

Although there was no longer a threat to Jasmine from the burn itself, the cause of the burn still had to be determined so that, if necessary, CPT Tremaine and other medical and social work professionals could take the steps required to effectively prevent Jasmine from suffering the same type of physical injury in the future. Moreover, as CPT Tremaine indicated at trial, such a procedure was nothing new. Physicians always seek to ascertain the cause of an injury in order to prevent similar injury in the future; and they always seek that information from

15

parents or guardians when injured children have not yet learned to speak, as was the case with nine-month old Jasmine.

Thus, CPT Tremaine's questioning of Appellant was all about Jasmine and her medical well-being (Bowerman's "protective measures"), and nothing about law enforcement or disciplinary action against Appellant (which had not even begun). The fact that the suspected cause of Jasmine's injury was criminal abuse as opposed to some accidental or natural occurrence (diagnosis), and the fact that the best way to prevent similar injury in the future was to remove Jasmine from the home as opposed to administer medicines or physical therapy (treatment), does not negate that dispositive fact that in this case.

That said, CPT Tremaine was not required to read Appellant his rights before questioning him about the cause of Jasmine's injury. This is so regardless of CPT Tremaine's duty to advise Child Protective Services (CPS) of the results of Jasmine's SCAN evaluation, and regardless of his duty to report suspected child abuse to criminal authorities. Bowerman, 39 M.J. at 222 (citing Raymond, 38 M.J. 136)(such duties "[do] not transform [a medical doctor] into a criminal investigator.").

### Counseling With Ms. Amlin

When his evaluation was complete, CPT Tremaine determined that Jasmine's burn was a "classic branding injury" and was not

16

accidental.  As a result, CPS removed Jasmine from Appellant's home.  About a year later, though, she was returned to the home, with the condition that Appellant move out and not visit the home while Jasmine was present, and the further condition that Appellant successfully complete counseling before returning permanently to the home.  All this took place in Hawaii.

Complying with the CPS order, Appellant moved out of the house.  However, sometime thereafter, he was transferred to Fort Drum, New York, while his wife and Jasmine remained in Hawaii.  Once at Fort Drum, Appellant went to the Family Advocacy Program seeking the counseling he needed to move back in with his family.  In due course, his case was randomly assigned to a civilian social worker named Ms. Amlin.  Prior to meeting with Appellant, Ms. Amlin reviewed a letter from the Hawaiian authorities that set forth the nature of the counseling Appellant had to receive in order to rejoin his family.  Specifically, Appellant had "to take ownership of the abuse [of Jasmine], to take responsibility for the abuse, to develop an empathy and understanding of the enormity of the consequences to the child – how it would impact the child psychologically."

Ms. Amlin met with Appellant four times, and although she never read him his rights before these sessions, she did inform him of her duty to disclose child abuse to both the military and

civilian authorities.  Eventually, Ms. Amlin did contact the authorities and inform them about instances of Appellant abusing his children.  However, at no time during her sessions with Appellant did she take any direction from any law enforcement authority.  Moreover, no law enforcement authority attended any of the sessions or directed that those sessions take place. Everything that took place during those sessions took place solely within the social work community, and in accordance with that community's standard operating procedures.

During his counseling sessions with Ms. Amlin, Appellant made statements that were used against him at his court-martial over the defense's objection.  Once again, the specific content of those statements is not yet germane and will be discussed in detail later.  For now, it is necessary only to decide whether Ms. Amlin was required to read Appellant his rights before the therapy sessions.  Appellant argues in Granted Issue IV that she was and that, as a result, his statements to her were inadmissible.  Appellant further argues that even if Ms. Amlin was not required to read him his rights, his statements to her were still inadmissible because they were coerced.  Appellant is wrong.

18

United States v. Diaz, No. 02-0513/AR

## Article 31(b) Warnings

Although by its terms, Article 31(b) applies only to someone "subject to the [UCMJ]," consistent with the rationale behind its passage, it also applies to a civilian investigator "(1) [w]hen the scope and character of the cooperative efforts demonstrate that the two investigations merged into an indivisible entity," and "(2) when the civilian investigator acts in furtherance of any military investigation, or in any sense as an instrument of the military[.]"  United States v. Penn, 18 C.M.A. 194, 199, 39 C.M.R. 194, 199 (1969)(internal quotations omitted).  See M.R.E. 305(d).  However, just as with military medical personnel, civilian medical personnel do not have to give Article 31 warnings to patients when they are acting "only in a legitimate medical capacity" and not "directly or indirectly in any law enforcement or disciplinary capacity." United States v. Moore, 32 M.J. 56, 60 (C.M.A. 1991).

As the facts in this case make clear, Ms. Amlin was not acting in furtherance of any military or law enforcement investigation, or as an accessory to any law enforcement effort. Her role was solely that of a licensed social worker trying to carry out the treatment plan mandated for Appellant.  As a result, Ms. Amlin was not required to give appellant Article 31 warnings before the counseling sessions.  See Moreno, 36 M.J. at

19

114-17 (no Article 31 warnings required when civilian social worker who knew case was substantiated and "turned over to the prosecutor's office" conducted counseling sessions with accused and urged him to admit his crimes as first step to recovery); see also Raymond, 38 M.J. at 138-40; Moore, 32 M.J. at 60-61.

### Army Regulation 608-18

Appellant argues that Dep't of the Army Regulation 608-18, The Army Family Advocacy Program (Sept. 1, 1995) [hereinafter AR 608-18], required Ms. Amlin to administer Article 31 warnings before her counseling sessions with Appellant. Appellant is incorrect. In Raymond, this Court concluded that AR 608-18

> is a personnel regulation, not a law enforcement
> regulation. . . . It is not a law enforcement
> program; it is a community services program. The
> cooperative effort required by the regulation
> [e.g. – the reporting requirement] does not render
> every member of the military community a criminal
> investigator or investigative agent but, rather,
> merely ensures that the competing interests of various
> segments of the military community accommodate each
> other as much as possible.

38 M.J. at 138-39. As a result, the Raymond Court held AR 608-18 did not require a social worker similar to Ms. Amlin to administer Article 31 warnings before counseling sessions similar to those in Appellant's case.

The version of AR 608-18 in effect at the time Raymond was decided is different from the version applicable in Appellant's

case, but not significantly.  Both have reporting requirements,

and both have the following language:

> Except when not required by law . . . soldiers
> suspected of spouse or child abuse will be advised of
> their rights under Article 31, UCMJ, and of their
> right to counsel prior to being questioned about abuse
> offenses.  Soldiers who are self-referrals will also
> be advised of their rights under Article 31, UCMJ, and
> of their right to counsel prior to being questioned
> about abuse offenses.

AR 608-18 at para. 3-21d (emphasis added); AR 608-18 at para.

3-24d (Sept. 18, 1987).  Thus, there is no reason to construe

the current version of AR 608-18 any differently than in Raymond

as it relates to the requirement of a rights warning before

therapeutic counseling sessions unrelated to law enforcement.

Such warnings are "not required by law," because this Court has

consistently said they are not.  See Bowerman, 39 M.J. at 221;

Raymond, 38 M.J. at 138-39; Moreno, 36 M.J. at 117; Fisher, 21

C.M.A. at 225, 44 C.M.R. at 279.

## Voluntariness

Appellant also argues that regardless of whether Ms. Amlin

should have read him his rights, his admissions to her were

involuntary and, therefore, inadmissible because he was required

to attend those sessions and accept responsibility for the

injuries to Jasmine before he could be reunited with his family.

See Arizona v. Fulminante, 499 U.S. 279, 285-87 (1991)(totality

of circumstances determines voluntariness of confession).  This
argument holds no sway in light of this Court's clear precedent
to the contrary.

In Moreno, the appellant was faced with a choice: he could
participate in counseling in an attempt to keep his family
together, with the result that anything he said might be used
against him at court-martial, or he could refuse to participate
in the counseling and risk losing his children.  He opted for
the former, and the foreseeable result came to pass -- he was
prosecuted and his statements were used against him.  On appeal,
he argued the "choice" he faced rendered his statements during
counseling involuntary.  This Court disagreed and said:

> It was something of a dilemma to be sure, but it
> was a dilemma of his own causing.  When people abuse
> children in this society, two distinct processes are
> triggered.  One is the criminal process, which focuses
> on the proper way to deal with the perpetrator.  The
> other is the child-protective process, which focuses
> on the preservation of and best interests of the
> child-victim.

36 M.J. at 112.  The Court then concluded that nothing was done
within the child-protective process to make the appellant's
statements involuntary (i.e., no "improper threats, inducements,
or promises").

Similarly, in United States v. Ellis, 57 M.J. 375 (C.A.A.F.
2002), detectives informed the appellant there was probable

cause to arrest both him and his wife, and that if both were arrested, their children would probably be removed from them and placed in foster care. Thereafter, the appellant indicated he wanted to talk, waived his rights, and confessed to child abuse crimes. Once again, the appellant argued his confession was involuntary because it was motivated by a desire to not lose his family. Once again, however, this Court disagreed and said:

> While the detectives' advice to appellant concerning removing the remaining children from the home may have contributed to his confession, the mere existence of a causal connection does not transform appellant's otherwise voluntary confession into an involuntary one.

Id. at 379 (citing Colorado v. Connelly, 479 U.S. 157, 164 n.2 (1986)).

For the same reasons, Appellant's statements and admissions to Ms. Amlin were not constitutionally involuntary. The fact that Appellant was required "to take ownership of the abuse [of Jasmine], to take responsibility for the abuse," in order to get Jasmine back does not lead to a different result. Factually, this is not that different from Moreno, where "[a]s a 'first step' in his recovery, [the therapist] urged [the] appellant to admit his conduct," which the appellant did, and which helped secure his conviction. 36 M.J. at 115. Legally too, then, the result in Appellant's case is the same -- constitutionally

23

voluntary statements, admissible against him as evidence of his other abuse of Nicole and Jasmine.

Appellant's Prior Abuse of Nicole and
Subsequent Abuse of Jasmine

Having disposed of the underlying Article 31 and voluntariness issues, I now return to the relevance and admissibility of Appellant's prior abuse of Nicole and subsequent abuse of Jasmine.  I deal first with his abuse of Jasmine by intentionally burning her, and I do so because (1) Appellant's conviction for that offense is completely insulated from any prejudice that possibly could flow from Dr. Stuemky's improper testimony, and (2) Appellant's confessed reason for committing that offense strengthens the conclusion that his prior acts of abusing Nicole were relevant and admissible.

Jasmine's Branding

Regarding the scarring on Jasmine's inner thigh, CPT Tremaine (who evaluated the injury for purposes of the SCAN work-up) gave expert testimony as follows:

> We saw a well-healed scar on . . . her upper thigh that had essentially a branding pattern to it, potentially three different distinct areas.
>
> . . . .
>
> It was a classic branding injury, where a hot object . . . [is] placed against the body and held there for a period, rendering a very distinct pattern, which

24

> based on the healing and scarring patterns, was
> consistent with three separate branding injuries.

(Emphasis added.)  This conclusion was confirmed by pictures of

the burn, admitted as Prosecution Exhibit 3.  Those pictures

disclose quite clearly -- in the words of CPT Tremaine -- a

"triangle" of scar tissue (i.e., "three separate branding

injuries") with "a very distinct border" surrounding a "central

area" of "normal skin" that "wasn't burned."  In other words, "a

classic branding injury," not an accidental burn from a lighter

falling one time onto Jasmine's thigh.  See United States v.

James, 55 M.J. 297, 301 (C.A.A.F. 2001)(appellant's admissions

supported by pictures in the record).

More importantly, however, Appellant admitted that he

intentionally burned Jasmine.  CPT Tremaine testified that when

he asked Appellant how Jasmine was burned, Appellant

> reported that Jasmine had been laid down to sleep that
> night, and when he went in to look in on her, he
> noticed a centipede laying in her crib.  He proceeded
> to obtain his lighter and to chase the centipede
> around the bed and try to burn the centipede.  While
> he was doing that, he reported that he'd taken Jasmine
> into his wife's – where his wife was, and his wife was
> in their bedroom.  He went back, got Jasmine, went to
> the living room, reported lighting a cigarette and
> dropping the lighter on Jasmine's leg.

Thereafter, Appellant repeated this lie to Ms. Amlin at the

beginning of their counseling sessions, but after several

additional sessions, he admitted intentionally burning Jasmine.

Ms. Amlin testified as follows in response to questions from the prosecution:

Q: During that first session, what did [Appellant] tell you about that burn?

A: Initially, he indicated that he was with the baby and he'd lit a cigarette, and had inadvertently dropped the lighter onto the child, causing the burn. I indicated that I felt that that probably wasn't possible, considering the lighter would have to be fairly hot, and just lighting a cigarette would probably not cause that type of burn or injury.

Mr. Diaz then changed his account of the events and indicated that there'd been an insect of some sort in the crib, and he didn't want it to bite the baby, so he was trying to [d]estroy the insect with the cigarette lighter, and while he was holding the baby and holding this lighter on this bug, he dropped it and burned the child.

Q: That was what [Appellant] told you during the first session?

A: Yes.

Q: During the second session, did [Appellant] tell you that story again?

A: Initially, yes, he did. I confronted him that again [sic]; it didn't seem like a plausible story. I recall asking him, "Why didn't you just step on this insect? Why didn't you hit it with something? Why didn't you just lift the baby up and away from the insect?" It seemed like an unusual way to go about protecting the child from an insect bite. At that point, I asked him, "What does DHS think? Do they think you did this on purpose?" And he said, "They'd say I did it." I said, "What would your wife's parents say?" And he said, "They'd say I did it." I then asked him what his parents would think about this, what would they say caused this accident, and he said, "They'd probably say I did it." I then asked him, "What's the likelihood that you did it? What percentage would you put on that you actually did this?" And he

26

looked at me and said, "One hundred percent."  At that point, he started to tell me what had actually happened.

. . . .

Q: Did you ask him how the injury to Jasmine occurred?

A: Yes, I did.

Q: What was [Appellant's] response?

A: He indicated that Mrs. Diaz was sleeping, it was late at night, he'd taken Jasmine from the crib.  He said he was on the sofa watching television.  He said he laid her down, heated the lighter up, got it hot and placed it on her thigh.  When I asked him why he did that, he said, "I wanted to see what she would do."

(Emphasis added.)

The majority concludes that even Appellant's conviction for burning Jasmine must be set aside as tainted by the improper testimony in this case.  Yet how the majority reaches this conclusion escapes me.  Appellant voluntarily confessed to Ms. Amlin both this crime and his motive.  Furthermore, the expert testimony of CPT Tremaine and the pictures of Jasmine's scarred leg corroborated this confession, and showed Appellant steadfastly had lied quite implausibly about the cause of Jasmine's injury.

In these circumstances, I conclude the improper testimony at this trial in no way affected the members' finding of guilty to the aggravated assault of Jasmine.  I further conclude that the strength of the evidence proving Appellant's aggravated

assault of Jasmine also made the evidence of Appellant's prior

abuse of Nicole relevant and admissible.

### Nicole's Burned Face and Other Injuries

About a year before Nicole's death, when she was only

several months old, she was taken to the hospital with second

and third degree burns on her face.  The intake worker at the

hospital that night testified Nicole "had a burn on her face, on

the left side, from just about her lip up to her hairline."  The

intake worker also testified Nicole "had three small, round

bruises just below the burn on the left side of her face."

Nicole was treated by Dr. Oscar Falcon, who testified as

follows regarding what he saw:

> I saw a young child with 2nd and 3rd degree burns to
> the right – I'm sorry, to the left mid-face.  The left
> eye, at that time, was swollen shut. . . . I also
> noted on the child that there were old bruises on the
> right cheek, and one on the right anterior chest.

As a result of this burn injury, two things took place.

Ultimately, Nicole was removed from Appellant's home and placed

in foster care.  Immediately, however, Dr. Stuemky also examined

Nicole in his role as a member of the Child Protection Committee

for Children's Hospital of Oklahoma.  Regarding Nicole's

injuries, he testified as follows:

> This was a baby that had 2nd degree burns, these were
> burns that cause blisters and redness, about the face,
> particularly on the left side of the face. . . .  It

28

encompasses above the eye much of the left side of the forehead, down over the top, down the bridge of the nose, over most of the anterior surface of the nose, under the eye, and down over the cheek and left side of the upper lip. . . .  [There were also] several bruises present on her cheek, the left side of her cheek, and . . . an older bruise on her chest.

Dr. Stuemky also testified that X-rays of Nicole revealed older, healing rib fractures on both sides of Nicole's body.  He testified it was "medically impossible for these fractures to have occurred at the time of birth.  These fractures happened after birth."  Finally, he testified as follows regarding Nicole's rib injuries:

Really, all the bones of infants and small children are very pliable.  They bend easier then they break . . . .  [T]he only cause of rib fractures in infants and small children, particularly posterior rib fractures [which Nicole had], is child abuse.  By that, we mean that it takes grabbing the child's chest and squeezing to bend those ribs and cause the fractures. . . .

Infants in major motor vehicle accidents, or in trauma where infants and small children [sic], if they fall out of a 5, 10 or 15-story building, certainly they can be killed in the fall, but you don't get rib fractures.  In major motor vehicle accidents, it's incredibly rare, even with massive injuries to the child, you can break arms and legs and die – but you don't get rib fractures in these infants and small babies. . . .

So, rib fractures in infants less than 2 years of age are considered indicative or pathenemonic for physical abuse.

In foster care, Nicole thrived for nine months without injury. Her foster parents testified that while in their care, Nicole's health was "excellent" and "she was not ill at all." However, Nicole was returned to Appellant's custody at the end of that time, and two months after that she was dead in his arms.

As stated earlier, Dr. Balding performed the autopsy on Nicole. In addition to his testimony that he could find no reason for her death other than suffocation, he testified he found "bruises to the scalp . . . right on the top of the head," and that X-rays showed "fractures to the leg that were unexplained." He also testified that "[w]ithout an explanation of those, one frankly suspects some type of an inflicted injury on the child."

Regarding the burn to Nicole's face, the intake worker testified Appellant "said that he was holding her over a vaporizer, and that's how she got the burn." Dr. Falcon, however, testified he was told "the steamer had fallen and hot water had splashed over the child's face." Dr. Falcon was "99 percent" sure it was Appellant who told him, and not Mrs. Diaz, but regardless of who actually told him, Appellant was present when Dr. Falcon was told that different version of the events.

Ms. Amlin also spoke with Appellant about the burn to Nicole, and testified she asked him, "Did you not see that the child was in distress?  Steam is very hot.  If she was burning, did the child not struggle or cry out or try to move away from the source of the heat?"  In response, Appellant indicated "that she made no movement at all," and "didn't give any indication that [she] was being hurt."  And with that response, Appellant's credibility evaporated, because the severity of the burn to Nicole's face made it implausible that she did not instantly and violently recoil in pain, and every member of Appellant's court-martial knew it once they saw the pictures of that injury, admitted as Prosecution Exhibit 10.  See James, 55 M.J. at 301 (appellate examination of photographs in the record); Charley, 189 F.3d at 1271 (appellant's lack of credibility at trial important factor in harmless error analysis).

Regarding the bruises to Nicole's cheek and chest, the intake worker testified Appellant said he caused them "by kissing on her – that he sucked on her like he likes to suck on girls."  Appellant's wife also testified that Appellant caused Nicole's bruises by kissing her.

Appellant argues in Granted Issue I that evidence of the prior injuries to Nicole was inadmissible propensity evidence. The majority agrees.  Unfortunately, the majority gets it very

31

wrong, and in the process completely ignores Supreme Court

precedent.

The Law

M.R.E. 404(b) states:

> Evidence of other crimes, wrongs, or acts is not
> admissible to prove the character of a person in order
> to show action in conformity therewith.  It may,
> however, be admissible for other purposes, such as
> proof of motive, opportunity, intent, preparation,
> plan, knowledge, identity, or absence of mistake or
> accident[.]

Thus, this Court has said that such evidence is admissible under

M.R.E. 404(b) when: (1) it reasonably supports a finding that

the accused committed the prior acts; (2) it makes a fact of

consequence at the trial more or less probable; and (3) its

probative value substantially outweighs any prejudicial effect.

United States v. Humpherys, 57 M.J. 83, 90 (C.A.A.F.

2002)(quoting United States v. Reynolds, 29 M.J. 105, 109

(C.M.A. 1989)).[3]

---

[3] This Court decided United States v. Reynolds, 29 M.J. 105 (C.M.A. 1989),
after the Supreme Court decided Huddleston v. United States, 485 U.S. 681
(1988).  Interestingly, Reynolds did not cite Huddleston, even though the
three-part test announced in Reynolds is identical in all material respects
to the three-part test announced in Huddleston for admissibility of 404(b)
evidence.  Nonetheless, because the two tests are the same; because
Huddleston involves Federal Rules of Evidence 401, 403, and 404(b), and
Reynolds involves Military Rules of Evidence 401, 403, and 404(b); and
because these Military Rules are "taken without change from the Federal
Rule[s]," Reynolds should not be applied in a manner inconsistent with
Huddleston.  See Manual for Courts-Martial, United States (2002 ed.),
Analysis of the Military Rules of Evidence at A22-33 and 34.

As to the first prong, the standard for satisfying it is "quite low." United States v. Dorsey, 38 M.J. 244, 246-47 (C.M.A. 1993)(citing Huddleston, 485 U.S. 681). That is especially true in child abuse death cases, which "present very unusual problems of proof. The circumstances of these cases suggest an even wider discretion than usual in admitting what is conceded to be extremely prejudicial evidence, consisting of other acts of abuse[.]" United States v. Leight, 818 F.2d 1297, 1304 (7th Cir. 1987)(child abuse death case).

Thus, in United States v. Harris, 661 F.2d 138 (10th Cir. 1981), also a child abuse death case, the court found evidence of healing bone and rib fractures was admissible, even though the prior injuries were unrelated to the victim's death, and even though there was no direct evidence the appellant inflicted those injuries. There was only inference from circumstantial evidence. In finding this evidence admissible, the court quoted from United States v. Woods, 484 F.2d 127, 133 (4th Cir. 1973), as follows:

> We think also that when the crime is one of infanticide or child abuse, evidence of repeated incidents is especially relevant because it may be the only evidence to prove the crime. A child of the age of Paul [eight months] . . . is a helpless, defenseless unit of human life. Such a child is too young, if he survives, to relate the facts concerning the attempt on his life, and too young, if he does not survive, to have exerted enough resistance that the

> marks of his cause of death will survive him.  <u>Absent
> the fortuitous presence of an eyewitness, infanticide
> or child abuse by suffocation would largely go
> unpunished.</u>

(Emphasis added.)  <u>See also</u> <u>United States v. White</u>, 23 M.J. 84

(C.M.A. 1986)(evidence of prior rib fractures and bruises to

body and scalp admissible in child abuse death case, even though

no direct evidence the appellant caused those injuries; only

inference from circumstantial evidence).  Applying these

principles to Appellant's case, I conclude all the evidence of

Nicole's prior injuries was admissible.

## Nicole's Burned Face

There is no doubt Appellant inflicted the burn to Nicole's

face, because he admitted it numerous times.  Thus, the first

part of the three-part test for admissibility of this evidence

is satisfied.  As for the second part -- whether the burn to her

face made a fact of consequence at the trial more or less

probable -- the answer to that is unequivocally yes.

One of the elements the Government had to prove in this

case was that Appellant's act of suffocating Nicole was with the

specific intent to kill or inflict great bodily harm on her.

<u>Manual for Courts-Martial, United States</u> (2002 ed.) [hereinafter

<u>MCM</u>], Part IV, para. 43.b.(2)(d).  However, direct evidence of

subjective intent many times is not available, leaving

34

circumstantial evidence of that intent as the only mode of proof.  And frequently, that circumstantial evidence is of prior, similar acts of the accused.  See Humpherys, 57 M.J. at 91.  Such prior acts help prove intent by lessening the possibility that the subsequent act was accidental -- a common sense proposition the Supreme Court has embraced but which a majority of this Court today rejects.

Thus, in McGuire, 502 U.S. 62, the defendant was charged with murdering his infant daughter.  To help prove its case, the prosecution introduced evidence of prior injuries to the daughter to prove "battered child syndrome."  Specifically, the prior injuries were rectal tears and rib fractures, and based on these prior injuries, two experts testified the victim was a battered child.  Id. at 65.

The defendant in McGuire was convicted of the murder, and thereafter, he filed a petition for habeas corpus relief in the district court.  His petition was denied, but he appealed to the Court of Appeals, which reversed and "ruled that the prior injury evidence was erroneously admitted to establish battered child syndrome, because no evidence linked McGuire to the prior injuries and no claim had been made at trial that the baby died accidentally."  Id. at 66.  To the contrary, McGuire generally denied any involvement in the child's death, and instead

35

speculated that she fell off the couch, or someone else killed her.  <u>Id.</u> at 65.

At this point, I note the similarity between the facts in Appellant's case and those in <u>McGuire</u>.  In both, there was a general denial of wrongdoing at trial, countered with evidence of prior injuries of the victim that experts testified indicated abuse, even though the prior injuries were not linked by direct evidence to the accused.  I also note that regarding this issue, the result reached by this Court's majority, and its rationale, are identical to the result reached by the Court of Appeals in <u>McGuire</u>, and its rationale (i.e., evidence of the prior injuries was inadmissible because there was no proof the accused caused the injuries, and there was only a general denial of wrongdoing at trial, not a specific claim of accident).

Yet in <u>McGuire</u>, the Supreme Court made clear that this result and rationale are incorrect.  Such evidence of prior injuries, it held, is admissible, <u>despite an accused's general denial of wrongdoing rather than a specific claim of accident, and despite an absence of direct evidence linking him to the prior injuries</u>.  In so holding, the Court reasoned as follows:

> Because the prosecution had charged McGuire with
> second-degree murder, it was required to prove that
> Tori's death was caused by the defendant's intentional
> act.  <u>Proof of Tori's battered child status helped to
> do just that; although not linked by any direct</u>

> evidence to McGuire, the evidence demonstrated that
> Tori's death was the result of an intentional act[.]
>
> . . . [T]he Court of Appeals also relied on the theory
> that, because no claim was made at trial that Tori
> died accidentally, the battered child syndrome
> evidence was irrelevant and violative of due process.
> This ruling ignores the fact that <u>the prosecution must
> prove all the elements of a criminal offense beyond a
> reasonable doubt</u>.  In this second-degree murder case,
> for example, the prosecution was required to
> demonstrate that the killing was intentional.  <u>By
> eliminating the possibility of accident, the evidence
> regarding battered child syndrome was clearly
> probative of that essential element</u> . . . . The Court
> of Appeals, however, ruled that the evidence should
> have been excluded because McGuire did not raise the
> defense of accidental death at trial.  <u>But the
> prosecution's burden to prove every element of the
> crime is not relieved by a defendant's tactical
> decision not to contest an essential element of the
> offense</u>.

502 U.S. at 68-69 (citations omitted)(emphasis added).

The same is true in Appellant's case, and applying the law

and logic of <u>McGuire</u>, I conclude the evidence of Nicole's burned

face satisfies the second part of the three-part test for

admissibility because it helped prove Nicole's death was caused

by Appellant's intentional act of suffocating her -- something

the Government was required to prove and could not be precluded

from proving simply because the defense chose generally to deny

causing Nicole's death rather than claim accident.  <u>See also</u>

<u>United States v. Robles-Ramos</u>, 47 M.J. 474 (C.A.A.F. 1998)(prior

instances of spouse abuse admissible to prove charged abuse was

not an accident); White, 23 M.J. at 87 (prior rib and other injuries admissible to prove intent and absence of accident in child abuse death case); United States v. Boise, 916 F.2d 497, 501 (9th Cir. 1990)(prior abuse probative of material issue of absence of accident); Leight, 818 F.2d at 1301, 1303 (same); State v. Norlin, 951 P.2d 1131, 1136-37 (Wash. 1998)(same).

That leaves only the third part of the test for admissibility -- whether the probative value of evidence of Nicole's burned face substantially outweighed any prejudicial effect. In this child abuse death case where there were no eyewitnesses and only circumstantial evidence to prove Nicole's death was not an accident, I conclude the probative value of that evidence outweighed any prejudicial effect. See Boise, 916 F.2d at 502 (argument that judge abused discretion by admitting evidence of prior abuse "lacks merit"); Leight, 818 F.2d at 1304 ("not an abuse of discretion to conclude that the probative value of earlier acts of child abuse outweighed the unfair prejudice of showing uncharged wrongs – even of a reprehensible character"); Harris, 661 F.2d at 142 ("A battered child is not a pretty picture. But in our view the evidence of other injuries was highly probative in nature."); Norlin, 951 P.2d at 1137 (probative value of such evidence "was great").

Thus, evidence of Nicole's burned face satisfied Supreme Court precedent, as well as this Court's three-part test for admissibility, and was properly admitted to help prove an essential element of the Government's case – that when Appellant suffocated Nicole, he did so intentionally and not by accident. That said, the military judge did not abuse his discretion by admitting that evidence. To hold otherwise not only ignores the prevailing Supreme Court jurisprudence applied by state and other federal courts, but also establishes a different and more difficult evidentiary standard for the prosecution of child abuse cases in the military justice system.

Nonetheless, the majority does hold otherwise, based on its conclusion that because McGuire is a habeas corpus case, it "is not a valid precedent for deciding an issue involving Military Rule of Evidence." __ M.J. at (37 n.3). Yet even if this conclusion is correct, it significantly overstates the issue in Appellant's case, and in doing so "misses the legal point." United States v. Mitchell, 58 M.J. 446, 448 (C.A.A.F. 2003).

As previously stated, there is a three-part test for admissibility under M.R.E. 404(b). The second part of that test is that the evidence must make a fact of consequence at the trial more or less probable. Reynolds, 29 M.J. at 109. In other words, the evidence must be relevant under M.R.E. 401, the

evidentiary rule cited by Reynolds in support of this part of the test.[4]  It is with respect to this limited and basic question only that McGuire is both instructive and precedential in Appellant's case.

As the majority correctly notes, because McGuire was a habeas corpus case, it was not concerned with "whether the California courts correctly applied the [state] rules of evidence[.]"  __ M.J. at (41 n.3).  Rather, McGuire was concerned only with "whether the admission of the evidence [of prior misconduct] violated McGuire's federal constitutional rights."  502 U.S. at 68.  In holding that it did not violate his constitutional rights, the Supreme Court concluded "that the prior injury evidence was relevant to an issue in the case," specifically, intent.  Id. at 70.  In other words, the Court concluded that the prior act evidence was "relevant" within the meaning of Federal Rule of Evidence 401.  See Fed.R.Evid. 1101(e) (Federal Rules of Evidence apply in habeas corpus cases).

That being the case, the evidence of Nicole's burned face was equally relevant under M.R.E. 401, because: (1) "[t]he

---

[4] Military Rule of Evidence 401 states: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

definition of 'relevant evidence' found within [M.R.E.] 401 is taken without change from the Federal Rule," MCM, Analysis of the Military Rules of Evidence at A22-33, and (2) "as the Military Rules of Evidence are largely derived from the Federal Rules of Evidence, we look to the federal Courts of Appeals for treatment of the issue[s]." United States v. Grant, 56 M.J. 410, 414 (C.A.A.F. 2002).

Thus, McGuire does not stand for the broad proposition that evidence of Nicole's burned face was admissible under M.R.E. 404(b). What it stands for is the narrow proposition that evidence of Nicole's burned face was relevant in Appellant's case under M.R.E. 401, and therefore satisfied one of the three distinct legal tests that all must be met before evidence is admissible under M.R.E. 404(b). That is all it stands for, and it does so regardless of the fact it is a habeas corpus case.

This is a legal reality the majority cannot refute, so rather than confront it on the merits, they simply ignore and obscure the issue with an overly broad and misleading conclusion that McGuire does not apply to M.R.E. 404(b) issues as a whole. But it does apply, in the limited way I just described, and the majority's failure either to acknowledge or refute that fact calls into question the viability of their entire opinion.

41

Nicole's Other Injuries

For the reasons just discussed, all of the evidence of Nicole's other injuries also satisfied the second and third parts of this Court's three-part test for admissibility, i.e., was more probative than prejudicial of the material fact of an intentional killing.  The only question remaining is whether evidence of those injuries also satisfied the first part of the test, i.e., reasonably supported a finding that Appellant caused those other injuries.

As to Nicole's cheek and chest bruises, the answer is clearly yes, because Appellant admitted to the intake worker that he caused them, and his wife testified that he caused them.  As to Nicole's fractured ribs, broken leg, and scalp bruises, the answer is also yes, because the standard is not whether direct evidence "establish[ed] that Appellant inflicted" those injuries, as the majority seems to imply, __ M.J. at (35) (emphasis added), but whether given all the circumstances of this case, the evidence could "reasonably support" a finding by the members that Appellant inflicted those injuries.  Reynolds, 29 M.J. at 109; Huddleston, 485 U.S. at 685 ("sufficient evidence to support a finding by the jury that the defendant committed the similar act").  In my view, the evidence easily supported that finding because it clearly established Appellant

42

"had both the inclination and the opportunity to commit the crimes."  Charley, 189 F.3d at 1271.

First, Appellant inflicted second and third degree burns on Jasmine and Nicole, and his confessed reason for burning Jasmine was "to see what she would do."  Second, Appellant and his wife were the primary caretakers of the children.  Third, Dr. Stuemky testified rib injuries like Nicole's could only be caused by abuse.  Fourth, Nicole was only a few months old at the time of these injuries, and was therefore immobile and unable to self-inflict them.  Fifth, there was no suggestion that Appellant's wife inflicted these injuries.  Sixth, there was no suggestion anyone else inflicted them.  And seventh, the sheer number of Nicole's injuries reduced the likelihood they were caused by others who periodically might have watched her.

Given these facts, I conclude the members of Appellant's court-martial could reasonably have found that Appellant inflicted Nicole's rib, leg, and head injuries.  See Boise, 916 F.2d at 502 (evidence supported conclusion the appellant caused the child's prior rib injuries, where he and his wife were the primary caregivers, and there was no suggestion she mistreated the child); Harris, 661 F.2d at 141 (facts and circumstances permitted jury to infer that defendant caused prior injuries where "[a]ny suggestion that it was possibly the mother who

43

mistreated [the child] is only that[,] a suggestion"); Norlin, 951 P.2d at 1137 (evidence supported conclusion the appellant caused prior rib injuries, where he and his wife were the primary caregivers, and wife testified prior injuries occurred when child was alone with the appellant).

As a result, all the evidence of Nicole's prior injuries satisfied this Court's three-part test for admissibility, and the military judge did not abuse his discretion in admitting it. Moreover, the military judge's response to Dr. Stuemky's improper testimony did much to cure the problem created by that testimony.

## The Military Judge's Response

Immediately after Dr. Stuemky's testimony contradicted the military judge's express instructions, trial defense counsel moved for a mistrial, but the military judge denied the request. Instead, the judge had Dr. Stuemky leave the courtroom and gave the members the following detailed instructions to cure any prejudice to Appellant from Dr. Stuemky's improper testimony:

> Members of the court, early on in this trial and during the case on several occasions, I've told you that you have to decide the facts in this case, and you have to make a determination as to whether a crime occurred. You have to make a determination as to the believability or credibility of witnesses. And you have to follow my instructions. Earlier on when we did the voir dire portion of the trial, I told you in my preliminary instructions – I told you that you were

required to follow the instructions that I gave you, and you all assured me that you could do that.

I'm going to give you some instructions concerning expert testimony. An expert – a person is allowed to testify as an expert because his testimony may be helpful to you in coming to conclusions about issues. The witness you've been hearing has been qualified as an expert in a specific discipline because his knowledge, skill, experience, training or education may assist you in understanding the evidence, or in determining a fact in issue. But [t]he point is that you have to determine the fact in issue. Do you understand that?

MEMBERS: [Affirmative responses.]

MJ: You are not required to accept the testimony of an expert witness or give it any more or less weight than that of an ordinary witness. But you should consider the expert's experience and qualifications in the specific area.

Expert witnesses are allowed to render opinions, and those opinions are only allowed if they're helpful to you, the fact finder. But again, bear in mind that you have the ultimate determination as to a conclusion about the issues in this case.

An expert witness cannot tell you that he thinks a crime occurred, because that's not helpful to you, because you have to decide that. An expert witness cannot tell you that a witness is lying or truthful, or he cannot even tell you that a crime occurred. Because you have to decide that based on all the evidence, and only the evidence, that's been presented to you in the courtroom. Do you understand that?

MEMBERS: [Affirmative responses.]

MJ: To the extent that Dr. Stuemky opined that he thought a crime occurred, and that a particular specific person committed that crime, you cannot consider that, because that's not helpful to you. You have to make that decision. Do you understand that?

MEMBERS:  [Affirmative responses.]

MJ: As I told you earlier this morning, there's nobody that can help you in that regard, because you have to make your decision based on the evidence that's presented to you here in court.  Nobody else has the unique situation of being present to hear all the evidence in court.  Do you understand what I'm telling you?

MEMBERS:  [Affirmative responses.]

MJ:  I'm telling you that you must disregard any testimony about whether a crime occurred, or whether this soldier committed a crime.  Do you understand that?

MEMBERS:  [Affirmative responses.]

MJ:  And you can't consider that for any reason during your deliberations.  Do you understand that?

MEMBERS:  [Affirmative responses.]

MJ:  I've gotten affirmative responses by every member to this point.  You can consider evidence that certain – as to an opinion about whether injuries were consistent with SIDS or not consistent with SIDS, or whether the injuries were consistent with a child-abuse type death.  But you cannot consider any testimony as to what this witness thought as to who did it.  Do you understand that?

MEMBERS:  [Affirmative responses.]

Having instructed the members in this manner and determined that they collectively understood and would follow them, the judge then took the added step of polling the members individually, asking each one if he or she understood and could follow the

46

instructions.  In response, each member stated for the record that he or she understood and would follow them.

### Conclusion

In light of (1) these curative measures taken by the military judge; (2) the strong expert testimony that SIDS could not be the cause of Nicole's death; (3) the strong expert testimony there was no cause of death other than suffocation; (4) the fact that only Appellant could have suffocated Nicole; (5) Appellant's prior abuse of Nicole and subsequent abuse of Jasmine; and (6) Appellant's complete lack of credibility, I conclude that the improper testimony in this case that Nicole's death was a homicide did not substantially influence the members' findings of guilty, and that as a result, the military judge did not err in refusing to grant a mistrial.  See Charley, 189 F.3d at 1272 ("In light of the strength of the properly admitted testimony . . ., and the relatively modest amount of erroneously admitted testimony, we cannot say that the erroneously admitted portions of the testimony substantially affected the trial's outcome[.]"); United States v. Taylor, 53 M.J. 195, 198 (C.A.A.F. 2000)(mistrial is "drastic remedy" needed only to prevent "miscarriage of justice"; curative instruction is "preferred"); Rule for Courts-Martial

915(a)(mistrial when "manifestly necessary in the interest of justice").

I would affirm the decision of the court below.